[Civ. No. 4382. First Appellate District, Division One.—May 29, 1923.]

## E. CARL BANK, Respondent, v. ELMER F. BELL, Auditor, etc., et al., Appellants.

[1] MUNICIPAL CORPORATIONS — MUNICIPAL AFFAIRS — FREEHOLDERS' CHARTERS—LEGISLATIVE POWERS.—Since the "municipal affairs" amendment of 1914 to the state constitution, the powers of such cities as have brought themselves within the condition of the amendments are not derived from the legislature, but from a freeholders' charter directly provided for by the constitution; and such cities in their several charters may make and enforce all laws and regulations in respect to municipal affairs subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by the general laws.

[2] ID.—ESTABLISHMENT OF MUNICIPAL MARKET.—The establishment, maintenance, equipment, ownership, and operation of a municipal market is a municipal affair and a municipal purpose.

[3] ID.—BERKELEY—RIGHT TO ESTABLISH AND MAINTAIN MUNICIPAL MARKET.—The city of Berkeley, under the provisions of its charter, has plenary power to acquire, establish, maintain, equip, own, and operate a municipal market, and also, acting through its council, power to take such legislative action as it may deem necessary and advisable in the premises.

---

1. *Mandamus* to compel payment of salary of public officer or employee, note, 5 A. L. R. 572.

APPEAL from a judgment of the Superior Court of Alameda County. H. D. Burroughs, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Richard B. Bell and R. M. F. Soto for Appellants.

Lemuel D. Sanderson, City Attorney, for Respondent.

ST. SURE, J.—This appeal involves the decision of the question whether or not the city of Berkeley has the power to acquire, establish, maintain, own, and operate a municipal market. In this connection provisions of the constitution of California relative to municipal affairs, certain sections of Berkeley's charter vital to its claims of "home rule," and ordinances passed in conformity therewith, are to be considered and discussed and an opinion thereon given.

The city of Berkeley, through its council, on February 23, 1921, adopted Ordinance No. 699, N. S., establishing a market to be known and designated as the Berkeley Municipal Market, declaring that said market shall be maintained, equipped, owned, and operated by the city of Berkeley; declaring the purposes of said market; determining the price at which foodstuffs shall be bought and sold by said market; requiring all funds from whatever source to be kept in a bank in the city of Berkeley; creating the office of market manager; providing the mode of filling the office of market manager; determining the mode of removing the market manager; prescribing the duties of market manager; authorizing the employment of other persons; providing the mode of discharging any employee of said market; determining the mode of fixing the compensation of the market manager and other employees of said market; requiring a bond in the sum of $10,000 to be filed by the market manager, and providing the terms and conditions thereof, and the manner of its approval; providing for a monthly report of said market manager to the council; providing for a monthly audit of the books of said market manager, and a report thereon by the city auditor to the council.

And for the further conduct and carrying on. of the municipal market the council also, on March 15, 1921,

adopted Ordinance No. 701, N. S., amending Ordinance No. 699, N. S., appropriating the sum of $5,000 to be constituted a revolving fund; providing that of this sum the sum of $2,000 shall be used for any necessary equipment for the Berkeley Municipal Market, and the sum of $3,000 shall be used for the purpose of paying for any shipments of foodstuffs, expenses of maintaining and operating said market, salaries or compensation of any persons connected with said market, or taking care of any unforeseen losses or contingencies, or the future needs of said market; providing for purchases by the market manager; providing the mode of payment for the same, and providing the mode of returning moneys to said revolving fund.

The appeal comes to us upon the judgment-roll. It is taken by Elmer F. Bell, as auditor of the city of Berkeley, and Ethel M. Duval, intervener, from a judgment awarding petitioner-respondent a peremptory writ of mandate commanding defendant, as auditor, to allow a warrant issued upon a claim passed and allowed by the council of said city, in favor of said petitioner, in the sum of $225 as monthly salary for services as market manager of the Berkeley Municipal Market, alleged to have been established under said ordinance. The petition, with appropriate allegations, stated facts sufficient to constitute a cause of action. A demurrer to the petition was overruled and defendant answered. Ethel M. Duval, as a taxpayer, later, by leave of court, filed her complaint in intervention, joining defendant and adopting as hers the answer filed by him.

The court found that all of the allegations of the complaint were true, and in addition found specially to the effect that at the time of the passage of the said ordinances, and ever since, there has been more than $5,000 in the general fund of the city treasury which has not been appropriated for any other purpose, and that it is under the control of the defendant as auditor.

As conclusions of law the court determined that a peremptory writ of mandate issue in conformity with the prayer of the petition to defendant as auditor, commanding him to obey the ordinances and indorse his allowance on the warrant in question here, and do whatever other acts are necessary to allow the said demand. Judgment was en-

tered in accordance therewith and defendant and intervener appealed.

Whether or not the judgment of the lower court shall stand must be answered on this appeal by the decision of the question adverted to in the first paragraph of this opinion.

The provisions of the law under which it is asserted the municipal market may be established and operated are the following:

Amendment of 1914 to the constitution of California, article XI, section 6, reading:

"Cities and towns hereafter organized under charters framed and adopted by authority of this Constitution, are hereby empowered, and cities and towns heretofore organized by authority of this Constitution may amend their charters in the manner authorized by this Constitution so as to become likewise empowered hereunder to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws." (Treadwell's Constitution, 4th ed., p. 376.)

Also section 8, of the same article of the constitution, which was amended to read:

"It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to general laws." (Treadwell's Constitution, 4th ed., p. 405.)

Section 47 of article IX (Powers of the City and of the Council) of the charter of the city of Berkeley:

"General Powers of the City. Sec. 47. Without denial or disparagement of other powers held under the Constitution and laws of the State, the City of Berkeley shall have the right and power:

"Public Buildings, Works and Institutions. (1) To acquire by purchase, condemnation or otherwise, and to establish, maintain, equip, own and operate, libraries, reading rooms, art galleries, museums, schools, kindergartens, parks, playgrounds, places of recreation, fountains, baths, public

toilets, markets, market houses, abattoirs, dispensaries, infirmaries, hospitals, charitable institutions, jails, houses of correction and farm schools, work houses, detention homes, morgues, cemeteries, crematories, garbage collection and garbage disposal and reduction works, street cleaning and sprinkling plants, quarries, wharves, docks, waterways, canals, and all other public buildings, places, works and institutions.

"Additional Powers. (62) To enact appropriate legislation and do and perform any and all other acts and things which may be necessary and proper to carry out the general powers of the City or any of the provisions of this Charter, and to exercise all powers not in conflict with the Constitution of the State with this Charter, or with ordinances adopted by the people of the city."

Section 115 of article XVI of the charter as added in 1921:

"Municipal Affairs. (Sec. 115) The City of Berkeley shall have the right and power to make and enforce all laws and regulations in respect to municipal affairs subject only to restrictions and limitations provided in this charter; provided, however, that nothing herein shall be construed to prevent or restrict the City from exercising or consenting to, and the City is hereby authorized to exercise all rights, powers and privileges heretofore or hereafter granted or prescribed by the general laws of the state." (Stats. 1921, p. 2023, c. 16. Assembly Concurrent Resolution No. 5.)

When the California constitutional convention of 1879 met, an attempt was made to liberate municipalities from the thraldom of legislative interference in their affairs. As originally adopted, the last sentence of section 6 of article XI read as follows: "Cities and towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this constitution, shall be subject to and controlled by general laws." In passing upon certain sections of the new constitution in *People* v. *Hoge* (1880), 55 Cal. 612, 618, Chief Justice Morrison said: "It was manifestly the intention of the constitution to emancipate municipal governments from the authority and control formerly exercised over them by the legislature." However, the municipalities got little comfort and no relief from the decisions of our supreme court construing section 6 of

article XI, and the doctrine was settled that the legislature had power by general laws to supersede or take away without the consent of the municipality the powers conferred upon it either by a special legislative charter or by a constitutional freeholders' charter, and also to prevent, by anticipation, freeholders' charters from regulating matters covered by general laws. "These decisions had demonstrated," said Mr. Justice Angellotti in *Ex parte Braun*, 141 Cal. 204, 209 [74 Pac. 780, 782], "that the power given by the constitution to cities to frame charters for their own government for the purpose, as was said in *People* v. *Hoge*, 55 Cal. 612, 618, of emancipating them from the authority and control formerly exercised over them by the legislature in municipal affairs, were unavailing if such charters could at once be superseded by any general legislative enactment. Under these circumstances the section of the constitution providing that all cities and towns and the charters thereof should be subject to and controlled by general laws was (1896) amended by the addition of the words 'except in municipal affairs.'"

The purpose of this so-called "municipal affairs" amendment was explained by Mr. Justice Garoutte in *Fragley* v. *Phelan*, 126 Cal. 383, 387 [58 Pac. 923, 925], as follows: "For the purpose of getting at the true significance of these words, there is no brighter light to be shed upon them, than is disclosed by a consideration of the reasons which moved the legislature to propose the amendment and the people to adopt it. What was the evil to be remedied? What was the good to be gained by this amendment? The answer is common, every-day history. It was to prevent existing provisions of charters from being frittered away by general laws. It was to enable municipalities to conduct their own business and control their own affairs, to the fullest possible extent, in their own way. It was enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs."

Since the decision in *Fragley* v. *Phelan* the "municipal affairs" provision of the constitution has been considered and construed in many cases by our supreme court, but as

was said by Mr. William Carey Jones in an article on the subject "Municipal Affairs of the Constitution" (California Law Review, January, 1913) : "The determination by the court whether any matter is or is not a municipal affair has not occasioned any serious trouble. Justices Garoutte, Harrison and Temple, in their several opinions in the Fragley case, took somewhat different views as to the import of the term and as to the criterion for deciding when an affair was municipal or was not municipal; but the solution of the question has never caused the court any real difficulty. Justice Angellotti has said in *Sunset Telegraph & Telephone Co.* v. *Pasadena,* 161 Cal. 265 [118 Pac. 796] : 'There has been much discussion in our decisions as to what matters are embraced in this term, and it has been said that it is very difficult, if not impossible, to give a general definition clearly defining the term "municipal affairs" and its scope.' Accordingly the court has wisely abstained from attempting to tie itself up with a definition, the concrete question being in each case whether the matter at issue was or was not within the scope of municipal functions. The court has carefully and judiciously discriminated between local and state affairs, and as a matter of fact in the larger number of litigated cases has held the 'affair' in question to be within the purview of municipal activity."

Sections 6 and 8 of article XI of the constitution were amended in 1914 as hereinbefore noted. In 1921 the city of Berkeley, in conformity with these amendments, added section 115, article XVI, to its charter. This charter amendment is in language identical with language contained in the charter of the city of Los Angeles, which has been construed by our supreme court in several recent cases.

The first case was that of *Civic Center Assn.* v. *Railroad Co.,* 175 Cal. 441 [166 Pac. 351]. Mr. Justice Shaw, in writing the opinion of the court, after quoting the words of the charter section, "To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter," said: "The city has brought itself within the conditions of the amendments of 1914 to sections 6 and 8 of article XI of the constitution. Thereupon, according to the terms of those sections of the constitution, its powers over municipal affairs became all-embracing, restricted, and

limited by the charter 'only,' and free from any interference by the state through general laws, including laws giving the Railroad Commission powers over public utilities. The result is that the city has become independent of general laws upon municipal affairs. Upon such affairs a general law is of no force with respect to Los Angeles. If its charter gives it powers concerning them, it has those powers; if its charter is silent as to any such power, no general law can confer it. Whether such powers heretofore conferred upon it by general law, if any there be, are now abrogated or suspended, is a question we need not decide.'' Then followed the opinion of Mr. Justice Wilbur in *Cole* v. *City of Los Angeles,* 180 Cal. 617, 622 [182 Pac. 436, 438], in which he quotes with approval the following language from *Civic Center Assn.* v. *Railroad Co.:* ''The result is that the city has become independent of general laws upon municipal affairs. Upon such affairs a general law is of no force with respect to Los Angeles. If its charter gives it powers concerning them, it has those powers; if its charter is silent as to any such power, no general law can confer it.'' Soon thereafter our supreme court again had occasion to consider and pass upon the Los Angeles charter amendment. This time Mr. Justice Lawlor, writing the opinion in *Morgan* v. *City of Los Angeles,* 182 Cal. 301, 306 [187 Pac. 1050, 1052], said: ''To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter; provided, however, that nothing herein shall be construed to prevent or restrict the city from exercising or consenting to, and the city is hereby authorized to exercise, any and all rights, powers and privileges heretofore or hereafter granted or prescribed by general laws of the state. This charter provision was in effect at the time the city initiated the bond proceedings in question, and respondents contend 'that the plain intent of the provision is to the effect that, if the city is independent of general laws upon municipal affairs, save only as it may be restricted or limited by its own charter, it has the power to exercise any right, power or privilege heretofore or hereafter granted or prescribed by general law, and nothing in this charter shall be construed to prevent or restrict the city from exercising or consenting to such right, power or privilege.' This contention is, in our opinion, sound, and

it must be held that under subdivision 51 of section 2 of article I of its charter, as amended in 1919, the city of Los Angeles was empowered to issue bonds under the provisions of the Municipal Bond Act of 1901.'' Next, Mr. Justice Lennon wrote the opinions in *Matter of Nowak,* 184 Cal. 701 [195 Pac. 402], and in *Matter of Galusha,* 184 Cal. 697 [195 Pac. 406]. In *Matter of Nowak* he said: ''The net result of this situation is that, as to municipal affairs, the charter, instead of being a grant of power, is, in effect, a limitation of powers, and, the imposition of the tax for revenue purposes being strictly a municipal affair, the city has the power to impose that tax unless the power was taken from it by the charter itself.'' And in *Matter of Galusha:* ''Petitioner then raises the question as to whether or not such power has, in fact, been delegated to the City of Los Angeles. It must be borne in mind that, as stated in *Matter of Nowak,* 184 Cal. 701 [195 Pac. 402], the City of Los Angeles is operating under a charter amended so as to render the charter a limitation upon powers rather than a grant of powers, so far as municipal affairs are concerned. (Charter of City of Los Angeles, art. I, sec. 2, subd. 51; Const., art. XI, sec. 6.) The question, then, is not whether the charter grants the power to impose the tax, but whether it prohibits the tax, and no such prohibition is to be found in the charter. Even if it be conceded, however, that an express grant of power is necessary in the instant case, for the reason that the taxation of attorneys is not a purely municipal affair but one in which the state is directly concerned, that would not defeat the tax in question, for the charter does contain an express grant.'' The latest expression of the supreme court upon this important constitutional question emanated from Mr. Justice Wilbur, author of the opinion in *Los Angeles Gas & Electric Corp.* v. *City of Los Angeles,* 188 Cal. 307 [205 Pac. 125]. He said: ''This provision of the constitution is in the article regulating the powers of the legislative department of the state government and is a limitation upon the power of the state legislature. The powers of the City of Los Angeles are not derived from the legislature, but from a freeholders' charter directly provided for by the constitution. That is to say, the people of the state through the constitution authorize the people of the city to regulate its affairs by a charter to

be framed by a board of freeholders and voted upon by the people of the city and approved by a resolution of the legislature. Section 31 of article IV has no application to a city charter. It is expressly provided by the constitution (article XI, section 6), that the city in its charter may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws. The sale and distribution of electrical energy manufactured by a city is a municipal affair and one over which the legislature of the state has no control.''

[1] To recapitulate, it appears that, since the ''municipal affairs'' amendments of 1914 to the constitution, for such cities as have brought themselves within the condition of the amendments, the law is firmly established as follows: The powers of the cities are not derived from the legislature, but from a freeholders' charter directly provided for by the constitution. The city in its charter may make and enforce all laws and regulations in respect to municipal affairs subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by the general laws. The powers of the city are all-embracing, restricted, and limited by the charter only and free from the interference of the state by general laws. The result is that the city has become independent of general laws upon municipal affairs. Upon such affairs a general law is of no force. If its charter gives it powers concerning them, it has those powers. If its charter is silent as to any such power, no general law can confer it. As to municipal affairs the charter, instead of being a grant of power, is, in effect, a limitation of powers. The city can exercise the power if the charter does not prohibit it. In a case (*Matter of Galusha*) not involving a purely municipal affair, one in which the state is directly concerned, the city may exercise the power where its charter contains an express grant. And a city that has, like Berkeley, amended its charter (section 115 of article XVI of Berkeley charter), in order to conform to the ''municipal affairs'' amendments to the constitution, is independent of general laws upon municipal affairs and save only as it may be restricted or limited by its own charter,

it has the power to exercise any right, power, or privilege heretofore or hereafter granted or prescribed by general law, and nothing in the charter shall be construed to prevent or restrict the city from exercising or consenting to such right, power or privilege.

[2] The decision in this case turns upon the answer to the question which now presents itself to us: Is the establishment, maintenance, equipment, ownership, and operation of the "Berkeley Municipal Market" a municipal affair?

In defining a "municipal affair" it has been said that "the true test is that which requires that the work should be essentially public and for the general good of all the inhabitants of the city. It must not be undertaken merely for gain or for private objects. Gain or loss may incidentally follow, but the purpose must be primarily to satisfy the need, or contribute to the convenience, of the people of the city at large. Within that sphere of action, novelty should impose no veto." (*Sun Printing etc. Assn.* v. *New York*, 8 App. Div. 230, 238 [40 N. Y. Supp. 607, 611, 612]; Id., 152 N. Y. 257 [37 L. R. A. 788, 46 N. E. 499].)

Time was when the sale of light and water to the public was attacked in the state of New York because it was thought not to be within the purview of the municipal powers of the city. The idea was then something new and it met with opposition. It was contended that the business that the city proposed engaging in was of a private, commercial nature, and that therefore the municipality was debarred from entering upon it. The case is to be found in 49 Hun, 550 [2 N. Y. Supp. 447], and is entitled *Hequenbourg* v. *City of Dunkirk et al.* In declaring the business a public use, the court said: "What is or what is not a municipal purpose is in many cases doubtful and uncertain, and it is the duty of the court in such cases to give weight to legislative determination, and not to annul its acts, unless it clearly appears that the act was not authorized."

In *Laughlin* v. *City of Portland* (1914), 111 Me. 486 [Ann. Cas. 1916C, 734, 51 L. R. A. (N. S.) 1143, 90 Atl. 318], the court said: "The courts have never attempted to lay down with minute detail an inexorable rule distinguishing public from private purposes, because it would be impossible to do so. Times change. The wants and necessities of the people change. The opportunity to satisfy those wants

and necessities by individual effort may vary. What was clearly a public use a century ago, may, because of changed conditions, have ceased to be such to-day. . . . What could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such to-day. Laws which were entirely adequate to secure public welfare then may be inadequate to accomplish the same results now. . . . ''

In *State* v. *Toledo*, 48 Ohio St. 112 [11 L. R. A. 729, 26 N. E. 1061], cited in *Jones* v. *City of Portland*, 245 U. S. 224 [Ann. Cas. 1918E, 660 L. R. A. 1918C, 765, 62 L. Ed. 252, 38 Sup. Ct.. Rep. 212], the court discussed the question as follows: ''Taxation implies an imposition for a public use. . . . But what are public purposes is a question that must be left to the legislature, to be decided upon its own judgment and discretion. . . . It is sufficient if every inhabitant who is so situated that he can use it, has the same right to use it as the other inhabitants. . . . The establishment of natural gas works by municipal corporations, with the imposition of taxes to pay the cost thereof, may be a new object of municipal policy. But in deciding whether in a given case, the object for which taxes are assessed is a public or private purpose, we cannot leave out of view the progress of society, the change of manners and customs and the development and growth of new wants, natural and artificial, which may from time to time call for a new exercise of legislative power. And in deciding whether such taxes shall be levied for the new purposes that have arisen, we should not, we think, be bound by an inexorable rule that would embrace only those objects for which taxes have been customarily and by long course of legislation levied.''

Again, in the case of *German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 389, 408 [L. R. A. 1915C, 1189, 58 L. Ed. 1011, 34 Sup. Ct. Rep. 612, 617], where the regulation of rates and premiums of fire insurance companies was upheld, Mr. Justice McKenna said:

''The principle was expressed to be, quoting Lord Chief Justice Hale, 'that when private property is affected with a public interest it ceases to be *juris privati* only' and it becomes 'clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large.' . . .

"Against that conservatism of the mind which puts to question every new act of regulating legislation and regards the legislation invalid or dangerous until it becomes familiar, government—state and national—has pressed on in the general welfare; and our reports are full of cases where in instance after instance the exercise of regulation was resisted and yet sustained against attacks asserted to be justified by the constitution of the United States.

"The dread of the moment having passed, no one is now heard to say that rights were restrained or their constitutional guaranties impaired. . . .

"They demonstrate that a business, by circumstances and its nature, may rise from private to be a public concern, and be subject in consequence to governmental regulation. . . .

"It would be a bold thing to say that the principle is fixed, inelastic, in the precedents of the past, and cannot be applied though modern economic conditions may make necessary or beneficial its application."

Mr. Justice Oliver Wendell Holmes, Jr., in *Opinion of Justices,* 155 Mass. 607 [15 L. R. A. 809, 30 N. E. 1146], said: "I am of the opinion that, when money is taken to enable a public body to offer to the public, without discrimination, an article of general necessity, the purpose is no less public when that article is wood or coal than when it is water or gas or electricity or education, to say nothing of cases like the support of paupers or the taking of land for railroads or public markets. I see no ground for denying the power of the legislature to enact the laws mentioned in the questions proposed. The need or expediency of such legislation is not for us to consider."

A case of compelling interest is that of *Green* v. *Frazier,* 253 U. S. 233 [64 L. Ed. 878, 40 Sup. Ct. Rep. 499]. Mr. Justice Day delivering the opinion of the court, in which it was held that legislation which provides for engaging the state in the business of manufacturing and marketing farm products, and providing homes for the people, and which appropriates money, creates a state banking system, and authorizes bond issues and taxation for carrying this scheme into effect, is not unconstitutional as respects taxpayers. In considering the matter the court upheld the state statute,

laid down the following general principles, and disposed of the matter as follows:

"What is a public purpose has given rise to no little judicial consideration. Courts, as a rule, have attempted no judicial definition of a 'public' as distinguished from a 'private' purpose, but have left each case to be determined by its own peculiar circumstances. Gray, Limitations of Taxing Power, section 176, 'Necessity alone is not the test by which the limits of state authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general wellbeing of society, and advance the present and prospective happiness and prosperity of the people.' Cooley, Justice, in *People* v. *Salem,* 20 Mich. 452. Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government. (*Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549, 569 [55 L. Ed. 328, 31 Sup. Ct. Rep. 259]; *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389 [L. R. A. 1915C, 1189, 58 L. Ed. 1011, 34 Sup. Ct. Rep. 612, see, also, Rose's U. S. Notes].)

"With the wisdom of such legislation, and the soundness of the economic policy involved we are not concerned. Whether it will result in ultimate good or harm it is not within our province to inquire."

In *Veterans' Welfare Board* v. *Jordan,* 189 Cal. 124 [22 A. L. R. 1515, 208 Pac. 284], our supreme court, through Mr. Justice Wilbur, mentioned the policy of *Green* v. *Frazier, supra,* as follows: "We therefore turn to the question of whether or not the purpose sought to be achieved by the law for the settlement of large tracts of land after their improvement by the state is a public purpose. The question is a federal as well as a state question, for the taking of money by taxation for private instead of public purposes is a violation of the federal as well as of the State Constitution. For that reason the decision of the Supreme Court of the United States in *Green* v. *Frazier, Governor, et al.,* 253 U. S. 233 [64 L. Ed. 878, 40 Sup. Ct. Rep. 499], in passing

upon certain statutes of North Dakota is of great, if not controlling, importance.''

In the cases last above cited and quoted from are discussed the questions, what is a municipal purpose, taxation for a public use and the effect of legislative determination. As the statements and conclusions set forth in these cases meet with our approval, many of the points raised by defendant and intervener are thus disposed of, and detailed notice and discussion by us obviated.

The ordinances of the city of Berkeley, under attack, comprehensively provide for the establishment and maintenance of a public market where *foodstuffs* shall be bought and sold, and where the public, without discrimination, may come and buy. Anything used for the sustenance of man is foodstuff. Before and since the great World War there has been a quickening of public interest in economic questions. Throughout the Union efforts have been made by commonwealth and municipality alike to exercise control over living costs. The efforts have, in the main, been directed toward lessening the cost of foodstuffs—necessities of human existence. The situation has, in some instances, become so acute that it is matter of common knowledge and cannot be overlooked by the court. There have been public meetings of the people at which on many occasions were discussed the supply, demand, and price of milk, bread, potatoes, sugar, meats, and other products of the farm and packing-house, all of which come under the designation of foodstuffs. Public welfare leagues and co-operative clubs have been organized in various communities throughout the state having for their avowed object and purpose the purchase and sale of foodstuffs, to the end that the pinch of poverty might not be felt by a long-suffering public. There has been and is popular demand upon government—national, state, and municipal—for relief, and it was undoubtedly in response to such urgent public necessity that the city of Berkeley established its municipal market. We therefore have no difficulty whatever in deciding that the establishment and maintenance of the municipal market is a municipal affair and a municipal purpose. **[3]** Furthermore, addressing ourselves generally to this important question, we are of the opinion that the city of Berkeley, under the provisions of its charter, has plenary power to acquire, establish, maintain, equip, own, and operate a municipal market, and also,

acting through its council, power to take such legislative action as it may deem necessary and advisable in the premises.

In answer to the argument that the ordinances are void because the market manager is permitted to handle the money derived from the market without any check upon him and contrary to law, we reply that "we are not required to anticipate that this will be done." (*Veterans' Welfare Board* v. *Riley*, 188 Cal. 607 [206 Pac. 631].) On the contrary, we should assume that the market manager will perform his duties in a lawful manner. As Mr. Chief Justice Beatty said in *Rode* v. *Siebe*, 119 Cal., at pages 520 and 521 [39 L. R. A. 342, 51 Pac. 870]: "The validity of a law is not to be tested, however, by its application to extreme cases involving the assumption of grossly arbitrary violation of their duties by public officers. If every law were declared unconstitutional which by the application of such a test could be shown capable of working injustice, we should have very few laws left."

As to the duties of the market manager and how they shall be performed, and as to whether or not the market shall be conducted for profit, these and kindred matters are all proper subjects for legislation by the city through its council, and with which, in the instant case, we can have no concern. The appeal, as we have stated, comes up on the judgment-roll alone. It is therefore assumed that the findings are true. The court specially found that there was in the general fund in the city under control of the defendant auditor ample funds with which to pay petitioner's claim.

We are satisfied that the judgment of the lower court was correct, and that the petitioner-respondent is entitled to a writ of mandate commanding defendant auditor to allow said warrant issued upon a claim passed and allowed by the council of said city in favor of petitioner-respondent, in the sum of $225 as monthly salary for services as market manager of the Berkeley Municipal Market. This being so, the judgment is affirmed.

Richards, J., and Tyler, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 26, 1923.