# GREEN ET AL. *v.* FRAZIER, GOVERNOR, ET AL.

## ERROR TO THE SUPREME COURT OF THE STATE OF NORTH DAKOTA.

No. 811. Argued April 19, 20, 1920.—Decided June 1, 1920.

When a state tax authorized by the legislature pursuant to the state constitution and upheld by the highest state court is called in question under the Fourteenth Amendment upon the ground that the purposes for which it is imposed are not of a public nature, every presumption must be indulged in its favor, and the united judgments of the people, legislature and court of the State that the purposes are public will be accepted unless clearly unfounded. P. 239. *Jones* v. *City of Portland*, 245 U. S. 217.

When a State sees fit, for the promotion of the public welfare, to enter into activities which in the past have been considered as entirely within the domain of private enterprise and to assist them by taxation, the wisdom of its legislation or the soundness of the economic policy involved cannot be considered by this court in passing upon the constitutionality of the taxation. P. 240.

Under the peculiar conditions existing in North Dakota, described in the opinion of its Supreme Court in this case, *held*, that legislation which provides for engaging the State in the businesses of manufacturing and marketing farm products, and of providing homes for the people, and which appropriates money, creates a state banking system and authorizes bond issues and taxation for carrying the scheme into effect, is not unconstitutional as respects taxpayers. P. 242.

176 N. W. Rep. 11, affirmed.

THE case is stated in the opinion.

*Mr. Thomas C. Daggett* for plaintiffs in error.

*Mr. Frederic A. Pike* for defendants in error.

MR. JUSTICE DAY delivered the opinion of the court.

This is an action by taxpayers of the State of North Dakota against Lynn J. Frazier, Governor, John N.

Hagan, Commissioner of Agriculture and Labor, William Langer, Attorney General, and Obert Olson, State Treasurer, and the Industrial Commission of that State to enjoin the enforcement of certain state legislation. The defendants Lynn J. Frazier, as Governor, William Langer, as Attorney General, and John Hagan, as Commissioner of Agriculture and Labor, constitute the Industrial Commission, created by the Act of February 25, 1919, [Laws 1919, c. 151] of the Sixteenth Legislative Assembly of the State of North Dakota.

The laws involved were attacked on various grounds, state and federal. The Supreme Court of North Dakota sustained the constitutionality of the legislation. So far as the decision rests on state grounds it is conclusive, and we need not stop to inquire concerning it. *Davis* v. *Hildebrant*, 241 U. S. 565. The only ground of attack involving the validity of the legislation which requires our consideration concerns the alleged deprivation of rights secured to the plaintiffs by the Fourteenth Amendment to the Federal Constitution. It is contended that taxation under the laws in question has the effect of depriving plaintiffs of property without due process of law.

The legislation involved consists of a series of acts passed under the authority of the state constitution, which are: (1) An act creating an Industrial Commission of North Dakota [Laws, 1919, c. 151] which is authorized to conduct and manage on behalf of that State certain utilities, industries, enterprises and business projects, to be established by law. The act gives authority to the Commission to manage, operate, control and govern all utilities, enterprises and business projects, owned, undertaken, administered or operated by the State of North Dakota, except those carried on in penal, charitable or educational institutions. To that end certain powers and authority are given to the Commission, among others: the right of eminent domain; to fix the buying price of things bought,

and the selling price of things sold incidental to the utilities, industries, enterprises and business projects, and to fix rates and charges for services rendered, having in mind the accumulation of a fund with which to replace in the general funds of the State the amount received by the Commission under appropriations made by the act; to procure the necessary funds for such utilities, industries, enterprises and business projects by negotiating the bonds of the State in such amounts and in such manner as may be provided by law. $200,000 of the funds of the State are appropriated to carry out the provisions of the act. (2) The Bank of North Dakota Act, [Laws 1919, c. 147] which establishes a bank under the name of "The Bank of North Dakota," operated by the State. The Industrial Commission is placed in control of the operation and management of the bank, and is given the right of eminent domain to acquire necessary property. Public funds are to be deposited in the bank, and the deposits are guaranteed by the State of North Dakota. Authority is given to transfer funds to other departments, institutions, utilities, industries, enterprises or business projects, and to make loans to counties, cities or political sub-divisions of the State, or to state or national banks on such terms as the Commission may provide. Loans to individuals, associations, and private corporations are authorized, when secured by duly recorded first mortgages on lands in the State of North Dakota. An appropriation of $100,000 is made immediately available to carry out the provisions of the act. (3) An act providing for the issuing of bonds of the State in the sum of $2,000,000, the proceeds of which are to constitute the capital of the Bank of North Dakota. [Laws 1919, c. 148.] The earnings of the bank are to be paid to the State Treasurer. Tax levies are authorized sufficient to pay the interest on the bonds annually. The bonds shall mature in periods of five years, and the Board of Equalization is authorized to levy a tax in an amount

equal to one-fifth of the amount of their principal. The State Treasurer is required to establish a bank bond payment fund into which shall be paid moneys received from taxation, from appropriations and from bank earnings. $10,000 is appropriated for the purpose of carrying the act into effect. (4) An act providing for the issuing of bonds in the sum of not exceeding $10,000,000, to be known as "Bonds of North Dakota, Real Estate Series." [Laws 1919, c. 154.] These bonds are to be issued for the purpose of raising money to procure funds for the Bank of North Dakota to replace such funds as may have been employed by it from time to time in making loans upon first mortgages upon real estate. The faith and credit of the State of North Dakota are pledged for the payment of the bonds. Moneys derived from the sale of the bonds are to be placed by the Industrial Commission in the funds of the bank, and nothing in the act is to be construed to prevent the purchase of the bonds with any funds in the Bank of North Dakota. It is further provided that the State Board of Equalization shall, if it appears that the funds in the hands of the State Treasurer are insufficient to pay either principal or interest, accruing within a period of one year thereafter, make a necessary tax levy to meet the indicated deficiency. Provision is made for the repeated exercise of the powers granted by the act, for the purposes stated. An appropriation of $10,000 is made for carrying into effect the provisions of this act. (5) An act declaring the purpose of the State of North Dakota to engage in the business of manufacturing and marketing farm products, and to establish a warehouse, elevator, and flour mill system under the name of "North Dakota Mill and Elevator Association" to be operated by the State. [Laws 1919, c. 152.] The purpose is declared that the State shall engage in the business of manufacturing farm products and for that purpose shall establish a system of warehouses, elevators, flour mills, factories, plants, machinery

and equipment, owned, controlled and operated by it under the name of the "North Dakota Mill and Elevator Association." The Industrial Commission is placed in control of the Association with full power, and it is authorized to acquire by purchase, lease or right of eminent domain, all necessary property or properties, etc.; to buy, manufacture, store, mortgage, pledge, sell and exchange all kinds of raw and manufactured farm food products, and by-products, and to operate exchanges, bureaus, markets and agencies within and without the State, and in foreign countries. Provision is made for the bringing of a civil action against the State of North Dakota on account of causes of action arising out of the business. An appropriation is made out of state funds, together with the funds procured from the sale of state bonds, to be designated as the capital of the Association. (6) An act providing for the issuing of bonds of the State of North Dakota in a sum not exceeding $5,000,000, to be known as "Bonds of North Dakota, Mill and Elevator Series," providing for a tax and making other provisions for the payment of the bonds, and appropriations for the payment of interest and principal thereof. [Laws 1919, c. 153.] The bonds are to be issued and sold for the purpose of carrying on the business of the Mill & Elevator Association. The faith and credit of the State of North Dakota are pledged for the payment of the bonds, both principal and interest. These bonds may be purchased with funds in the Bank of North Dakota. Taxes are provided for sufficient to pay the bonds, principal and interest, taking into account the earnings of the Association. The sum of $10,000 is appropriated from the general funds of the State to carry the provisions of the act into effect. (7) The Home Building Act declares the purpose of the State to engage in the enterprise of providing homes for its residents and to that end to establish a business system operated by it under the name of "The Home Building Associa-

tion of North Dakota"; and defines its duties and the extent of its powers. [Laws 1919, c. 150.] The Industrial Commission is placed in control of "The Home Building Association," and is given the power of eminent domain, and the right to purchase and lease the requisite property. Provision is made for the formation of home building unions. The price of town homes is placed at $5,000, and of farm homes at $10,000. A bond issue of $2,000,000, known as "Bonds of North Dakota Home Building Series," is provided for.

There are certain principles which must be borne in mind in this connection, and which must control the decision of this court upon the federal question herein involved. This legislation was adopted under the broad power of the State to enact laws raising by taxation such sums as are deemed necessary to promote purposes essential to the general welfare of its people. Before the adoption of the Fourteenth Amendment this power of the State was unrestrained by any federal authority. That Amendment introduced a new limitation upon state power into the Federal Constitution. The States were forbidden to deprive persons of life, liberty and property without due process of law. What is meant by due process of law this court has had frequent occasion to consider, and has always declined to give a precise meaning, preferring to leave its scope to judicial decisions when cases from time to time arise. *Twining* v. *New Jersey*, 211 U. S. 78, 100.

The due process of law clause contains no specific limitation upon the right of taxation in the States, but it has come to be settled that the authority of the States to tax does not include the right to impose taxes for merely private purposes. *Fallbrook Irrigation District* v. *Bradley*, 164 U. S. 112, 155. In that case the province of this court in reviewing the power of state taxation was thoroughly discussed by the late Mr. Justice Peckham speak-

ing for the court. Concluding the discussion of that subject (p. 158) the Justice said: "In the Fourteenth Amendment the provision regarding the taking of private property is omitted, and the prohibition against the State is confined to its depriving any person of life, liberty or property, without due process of law. It is claimed, however, that the citizen is deprived of his property without due process of law, if it be taken by or under state authority for any other than a public use, either under the guise of taxation or by the assumption of the right of eminent domain. In that way the question whether private property has been taken for any other than a public use becomes material in this court, even where the taking is under the authority of the State instead of the Federal government." Accepting this as settled by the former adjudications of this court, the enforcement of the principle is attended with the application of certain rules equally well settled.

The taxing power of the States is primarily vested in their legislatures, deriving their authority from the people. When a state legislature acts within the scope of its authority it is responsible to the people, and their right to change the agents to whom they have entrusted the power is ordinarily deemed a sufficient check upon its abuse. When the constituted authority of the State undertakes to exert the taxing power, and the question of the validity of its action is brought before this court, every presumption in its favor is indulged, and only clear and demonstrated usurpation of power will authorize judicial interference with legislative action.

In the present instance under the authority of the constitution and laws prevailing in North Dakota the people, the legislature, and the highest court of the State have declared the purpose for which these several acts were passed to be of a public nature, and within the taxing authority of the State. With this united action of people,

legislature and court, we are not at liberty to interfere unless it is clear beyond reasonable controversy that rights secured by the Federal Constitution have been violated. What is a public purpose has given rise to no little judicial consideration. Courts, as a rule, have attempted no judicial definition of a "public" as distinguished from a "private" purpose, but have left each case to be determined by its own peculiar circumstances. Gray, Limitations of Taxing Power, § 176, "Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people." Cooley, Justice, in *People v. Salem*, 20 Michigan, 452. Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government. *Chicago, Burlington & Quincy R. R. Co. v. McGuire*, 219 U. S. 549, 569; *German Alliance Insurance Co. v. Lewis*, 233 U. S. 389.

With the wisdom of such legislation, and the soundness of the economic policy involved we are not concerned. Whether it will result in ultimate good or harm it is not within our province to inquire.

We come now to examine the grounds upon which the Supreme Court of North Dakota held this legislation not to amount to a taking of property without due process of law. The questions involved were given elaborate consideration in that court, and it held, concerning what may in general terms be denominated the "banking legislation," that it was justified for the purpose of pro-

viding banking facilities, and to enable the State to carry out the purposes of the other acts, of which the Mill & Elevator Association Act is the principal one. It justified the Mill & Elevator Association Act by the peculiar situation in the State of North Dakota, and particularly by the great agricultural industry of the State. It estimated from facts of which it was authorized to take judicial notice, that 90% of the wealth produced by the State was from agriculture; and stated that upon the prosperity and welfare of that industry other business and pursuits carried on in the State were largely dependent; that the State produced 125,000,000 bushels of wheat each year. The manner in which the present system of transporting and marketing this great crop prevents the realization of what are deemed just prices was elaborately stated. It was affirmed that the annual loss from these sources (including the loss of fertility to the soil and the failure to feed the by-products of grain to stock within the State), amounted to fifty-five millions of dollars to the wheat raisers of North Dakota. It answered the contention that the industries involved were private in their nature, by stating that all of them belonged to the State of North Dakota, and therefore the activities authorized by the legislation were to be distinguished from business of a private nature having private gain for its objective.

As to the Home Building Act, that was sustained because of the promotion of the general welfare in providing homes for the people, a large proportion of whom were tenants moving from place to place. It was believed and affirmed by the Supreme Court of North Dakota that the opportunity to secure and maintain homes would promote the general welfare, and that the provisions of the statutes to enable this feature of the system to become effective would redound to the general benefit.

As we have said, the question for us to consider and de-

termine is whether this system of legislation is violative of the Federal Constitution because it amounts to a taking of property without due process of law. The precise question herein involved so far as we have been able to discover has never been presented to this court. The nearest approach to it is found in *Jones* v. *City of Portland*, 245 U. S. 217, in which we held that an act of the State of Maine authorizing cities or towns to establish and maintain wood, coal and fuel yards for the purpose of selling these necessaries to the inhabitants of cities and towns, did not deprive taxpayers of due process of law within the meaning of the Fourteenth Amendment. In that case we reiterated the attitude of this court towards state legislation, and repeated what had been said before, that what was or was not a public use was a question concerning which local authority, legislative and judicial, had especial means of securing information to enable them to form a judgment; and particularly, that the judgment of the highest court of the State declaring a given use to be public in its nature, would be accepted by this court unless clearly unfounded. In that case the previous decisions of this court, sustaining this proposition, were cited with approval, and a quotation was made from the opinion of the Supreme Court of Maine justifying the legislation under the conditions prevailing in that State. We think the principle of that decision is applicable here.

This is not a case of undertaking to aid private institutions by public taxation as was the fact in *Citizens' Savings & Loan Association* v. *Topeka*, 20 Wall. 655, 665. In many instances States and municipalities have in late years seen fit to enter upon projects to promote the public welfare which in the past have been considered entirely within the domain of private enterprise.

Under the peculiar conditions existing in North Dakota, which are emphasized in the opinion of its highest court,

if the State sees fit to enter upon such enterprises as are here involved, with the sanction of its constitution, its legislature and its people, we are not prepared to say that it is within the authority of this court, in enforcing the observance of the Fourteenth Amendment, to set aside such action by judicial decision.

*Affirmed.*