## UNITED STATES v. CERTAIN LANDS IN CITY OF LOUISVILLE, JEFFERSON COUNTY, KY., et al.*

### No. 7000.

Circuit Court of Appeals, Sixth Circuit.
July 15, 1935.

As Amended Oct. 9, 1935.

ALLEN, Circuit Judge, dissenting.

H. W. Blair and Lloyd H. Landau, both of Washington, D. C. (Aubrey Lawrence and H. A. Berman, both of Washington, D. C., George C. Bunge, of Chicago, Ill., and Shackelford Miller, Jr., of Louisville, Ky., on the brief), for appellant.

Charles Middleton, of Louisville, Ky. (Chesley H. Searcy, of Louisville, Ky., on the brief), for appellees.

Before MOORMAN, HICKS, and ALLEN, Circuit Judges.

MOORMAN, Circuit Judge.

This is an appeal from a judgment of the District Court for the Western District of Kentucky dismissing the petition in a suit filed by the United States to condemn four city blocks within the city of Louisville for the construction of a low-cost housing and slum-clearance project under the provisions of title 2 of the National Industrial Recovery Act (48 Stat. 195). The petition alleged that the action was brought at the request of the Federal Emergency Administrator of Public Works, who, pur-

*Writ of certiorari granted 56 S. Ct. 154, 80 L. Ed. ——.

suant to and acting under authority vested in him by the National Industrial Recovery Act, had prepared a program of public works which included the construction of a low-cost housing and slum-clearance project in the city of Louisville, known as the Louisville housing project; that by virtue of the authority vested in him by the act the Administrator had found it necessary and advantageous to acquire an estate in fee simple in the lands described in the petition for the purpose of constructing a low-cost housing and slum-clearance project thereon; that acting through the Administrator pursuant to the provisions of the act the United States proposed to construct, erect, and build such a project on the lands; and that they were needed for a public use and purpose. Subsequent to the filing of the action, the government filed a written motion for the appointment of commissioners to assess the damage to the owners of the property sought to be condemned, but before commissioners were appointed one of the owners, Gernert, filed a demurrer to the petition. The trial court sustained the demurrer, and, upon the failure of the government to plead further, dismissed the petition on the ground that it was not within the power of the government to condemn the property for the purposes for which it was designed. (D. C.) 9 F. Supp. 137.

Section 201 (a) of title 2 of the National Industrial Recovery Act (40 USCA § 401 (a) authorizes the President to create a Federal Emergency Administration of Public Works and to appoint a Federal Emergency Administrator. Section 202 (40 USCA § 402) authorizes the Administrator to prepare a comprehensive program of public works to include, among other things, "construction, reconstruction, alteration, or repair under public regulation or control of low-cost housing and slum-clearance projects." Section 203 (a), 40 USCA § 403 (a), quoted in the margin,[1] author-

izes the President, through the Administrator or through such other agencies as he may designate, to acquire, by the exercise of the power of eminent domain, any real or personal property in connection with the construction of any low-cost housing or slum-clearance project, and to sell any property so acquired, or to lease such property, with or without the privilege of purchase. Section 220 (40 USCA § 411) authorizes an appropriation of $3,300,000,000 to carry out the purposes of the act. By the Fourth Deficiency Act passed the same day (48 Stat. 274), Congress made the appropriation to carry into effect the provisions of the act.

There is nothing in the act under which the appellant is proceeding to serve as a guide to the President in exercising the powers conferred upon him; no requirement that his actions be conditioned upon findings of fact made by himself or the administrator; no standards supplied with reference to low-cost houses and slum-clearance projects. Nothing is said as to what shall be deemed a slum or a low-cost house or housing project. There is no designation of the cities or counties or states in which such projects shall be established, nor any standards fixed by which the administrator is to determine where they are to be established. Neither is there any limitation or requirement imposed upon the administrator with reference to the spending of the money appropriated for these purposes. All of this is left to the unfettered discretion or choice of the President through his administrator without any standards by which he is to act. It is argued for the appellee, with much force and persuasiveness, that this unlimited power given to the President or his administrator to determine such matters without the aid of congressional standards is an illegal delegation of legislative authority under the rulings of the Supreme Court in Panama Refining Co. v. Ryan, 293 U. S.

<hr>

[1] "With a view to increasing employment quickly (while reasonably securing any loans made by the United States) the President is authorized and empowered, through the Administrator or through such other agencies as he may designate or create, (1) to construct, finance, or aid in the construction or financing of any public-works project included in the program prepared pursuant to section 202 [section 402]; (2) upon such terms as the President shall prescribe, to make grants to States, municipalities, or other public bodies for the construction, repair, or improvement of any such project, but no such grant shall be in excess of 30 per centum of the cost of the labor and materials employed upon such project; (3) to acquire by purchase, or by exercise of the power of eminent domain, any real or personal property in connection with the construction of any such project, and to sell any security acquired or any property so constructed or acquired or to lease any such property with or without the privilege of purchase. * * *"

388, 55 S. Ct. 241, 79 L. Ed. 446, and A. L. A. Schechter Poultry Corporation v. United States, 55 S. Ct. 837, 79 L. Ed. ——, decided May 27, 1935. We place our decision upon the second objection to the proceeding, viz., the lack of right in the government to exercise the power of eminent domain for the purposes contemplated by the act.

■ The government of the United States is one of delegated powers. There is no constitutional provision expressly authorizing it to exercise the power of eminent domain. It is nevertheless well settled that this power belongs to the government as an attribute of its sovereignty. Kohl v. United States, 91 U. S. 367, 23 L. Ed. 449; Shoemaker v. United States, 147 U. S. 282, 299, 13 S. Ct. 361, 37 L. Ed. 170; Chappell v. United States, 160 U. S. 499, 509, 510, 16 S. Ct. 397, 40 L. Ed. 510. Equally well settled is it that the right can only be exercised where the property is to be taken for a public use. The contention of the government is that the property here sought to be condemned is to be devoted to a public use because, first, the construction of the project will relieve unemployment during the period of construction, and, secondly, the leasing or selling of the new buildings at reasonable prices will give to persons of low incomes an opportunity to improve their living conditions. We do not think the first of these purposes, if made effective, could be said to constitute the use to which the property is to be put. While the act purports to authorize the construction with the view of relieving unemployment, it provides that the property when taken and after the project is constructed is to be leased or sold. The assertion that the taking of property to relieve unemployment and to improve living conditions among low-salaried workers is a taking for a public use rests upon the view that any taking which will advance the interest or well-being of a selected group of citizens will result in a benefit or advantage to larger groups or the entire community and must be regarded as a taking for a public use. It is argued that the right to take the property is conferred by clause 1, § 8, art. 1 of the Constitution which gives Congress the power "to lay and collect Taxes, * * * to pay the Debts and provide for the common Defence and general Welfare of the United States." The contention is that under this clause of the Constitution the power of Congress to levy taxes and appropriate the receipts therefrom to such purposes as it may deem in the interest of the public welfare is practically unlimited, and that this power carries with it the right to acquire property by condemnation upon which Congress may expend tax funds. We need not inquire into the extent of the taxing powers of Congress under this clause of the Constitution—whether it may levy and collect taxes and make appropriations ad libitum, or cannot use its powers thereunder beyond those subjects over which it is elsewhere given express authority by the Constitution. It has been thought by many students of the Constitution that the authority of Congress, both as to levying taxes and spending the proceeds thereof, is limited to the purposes necessary to the exercise of the other enumerated powers delegated to it in the Constitution. Story on Constitution, vol. 1, p. 703; 4 Jefferson's Correspondence, 524; 17 Congressional Record, part 2, p. 1439. So far as we know, there is no Supreme Court case which undertakes to say how far this authority extends. An attempt to have it determined with respect to the Maternity Act (42 Stat. 224 [42 USCA §§ 161–174]) was unsuccessful. Commonwealth of Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078. It is true, as stated by the government in argument, that Congress has established many bureaus and agencies and made appropriations of tax funds to support them for purposes which in its judgment would promote the general welfare. It is not to be inferred from these activities, however, that there is authority for the act here in question, for constitutional authority cannot be created by congressional act or purpose to aid beneficently established governmental bureaus and other agencies. It may be that the constitutional power of Congress goes far enough to justify donations of federal tax funds to a state, bureau, or other agency to use for the purposes which are said to be those of this proceeding. That question is not before us, and we, of course, do not undertake to decide it. Whatever its extent in that respect may be, in our opinion it does not carry with it the power here claimed, to condemn private property to the end that appropriations of tax funds may be made for purposes deemed by Congress to be for the public welfare.

■ The term "public use," as applied to the federal government's power of eminent domain, is not susceptible of precise

definition under the Supreme Court decisions. It includes, of course, property needed for use by the public through its officers and agents in performing their governmental duties. Chappell v. United States, supra. The trial court was of opinion that it means use by the government in carrying out its legitimate governmental functions, or a use in relation thereto open to all the public though practically available only to a part of it. The government contends that it means any use which will promote the general welfare through benefits or advantages conferred upon a considerable number of residents of the community. It points to statements in the authorities to the effect that use by the general public is not a universal test of the term. Strickley v. Highland Boy Mining Co., 200 U. S. 527, 531, 26 S. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174. Reference is also made to decisions holding that it is not a fatal objection to the taking that the use is to be limited to a small group or to a single person. Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 161, 17 S. Ct. 56, 41 L. Ed. 369; Mt. Vernon-Woodberry Cotton Co. v. Alabama Power Co., 240 U. S. 30, 32, 36 S. Ct. 234, 60 L. Ed. 507; Rindge Co. v. Los Angeles County, 262 U. S. 700, 707, 43 S. Ct. 689, 67 L. Ed. 1186. The proceedings in these cases were instituted, however, under state statutes passed to effectuate the purposes of a declared public policy of the state. What the cases hold is that there is nothing in the Fourteenth Amendment to prevent a state from exercising the power of eminent domain to carry into effect a public policy which, in the light of the needs and exigencies of the state, may be regarded as promotive of the public interest. This was the ground of decision in Clark v. Nash, 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171, and Green v. Frazier, 253 U. S. 233, 40 S. Ct. 499, 503, 64 L. Ed. 878. In the latter case, the court upheld state legislation authorizing the state to organize a bank and operate it, to establish elevators, warehouses, and flour mills, and to engage in the businesses of manufacturing and marketing, and the building of homes for residents of the state. The court said: "If the state sees fit to enter upon such enterprises as are here involved, with the sanction of its Constitution, its Legislature and its people, we are not prepared to say that it is within the authority of this court, in enforcing the observance of the Fourteenth Amendment, to set aside such action by judicial decision."

■■■ Decisions dealing with condemnation proceedings are to be considered in the light of the powers possessed by the sovereign seeking to exercise the right. What is a public use under one sovereign may not be a public use under another. Clark · v. Nash, supra. The state and federal governments are distinct sovereignties, each independent of the other and each restricted to its own sphere. Kohl v. United States, supra. Neither can invade or usurp the rightful powers or authority of the other. Hammer v. Dagenhart, 247 U. S. 251, 275, 276, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Child Labor Tax Case, 259 U. S. 20, 37, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432. In the exercise of its police power a state may do those things which benefit the health, morals, and welfare of its people. The federal government has no such power within the states. Green v. Frazier, supra, and Jones v. City of Portland, 245 U. S. 217, 224, 38 S. Ct. 112, 114, 62 L. Ed. 252, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660, dealt with State legislation enacted pursuant to this power. In the latter case the court pointed out that it was not its function, under authority of the Fourteenth Amendment, "to supervise the legislation of the states in the exercise of the police power beyond protecting against exertions of such authority in the enactment and enforcement of laws of an arbitrary character." Thus in these and other cases involving state action the court dealt with the subject of public use as it pertained to the powers of the sovereign claiming the right to take. It must be similarly dealt with in the case at bar. As so considered with reference to the federal government, it does not, in our opinion, include the relief of unemployment as an end in itself or the construction of sanitary houses to sell or lease to low-salaried workers or residents of slum districts. The tearing down of the old buildings and the construction of new ones on the land here sought to be taken would create, it is true, a new resource for the employment of labor and capital. It is likewise true that the erection of new sanitary dwellings upon the property and the leasing or the selling of them at low prices would enable many residents of the community to improve their living conditions. It may be, too, that these group benefits,

so far as they might affect the general public, would be beneficial. If, however, such a result thus attained is to be considered a public use for which the government may condemn private property, there would seem to be no reason why it could not condemn any private property which it could employ to an advantage to the public. There are perhaps many properties that the government could use for the benefit of selected groups. It might be, indeed, that by acquiring large sections of the farming parts of the country and leasing the land or selling it at low prices it could advance the interest of many citizens of the country, or that it could take over factories and other businesses and operate them upon plans more beneficial to the employees or the public, or even operate or sell them at a profit to the government to the relief of the taxpayers. The public interest that would thus be served, however, cannot, we think, be held to be a public use for which the government, in the exercise of its governmental functions, can take private property. The taking of one citizen's property for the purpose of improving it and selling or leasing it to another, or for the purpose of reducing unemployment, is not, in our opinion, within the scope of the powers of the federal government.

The judgment is affirmed.

ALLEN, Circuit Judge (dissenting).

I cannot agree that the condemnation prayed for is unauthorized under the United States Constitution. The case in my judgment does not fall within the doctrine of Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 79 L. Ed. 446, and A. L. A. Schechter Poultry Corp. v. United States, 55 S. Ct. 837, 79 L. Ed. ——, decided May 27, 1935. In those decisions the delegation held invalid was a delegation of legislative power. The sections of the Act here involved provide for no code nor penalty, but relate to a purely executive function, namely, the preparation and carrying out of a comprehensive program of public works, including low-cost housing and slum-clearance projects.

If Panama Refining Co. v. Ryan, supra, and Schechter Poultry Corp. v. United States, supra, are controlling, the standards therein held to be necessary exist in these sections of the statute. The terms used are defined in the dictionary, and are understood in common speech. Slum clearance involves the wrecking of houses in a slum and the clearing of slum lands for new and sanitary dwellings. "Low-cost housing" is not ambiguous. Such projects have been carried on in civilized countries, including the United States, for many years. The self-liquidating feature of the project arising from the authority to lease and sell the properties is incidental to the main questions. We are not confronted with an arbitrary misuse of power, for the case is presented on demurrer, and the acts held by the trial court to be unauthorized come squarely within the purview of the statute.

The questions are whether under the Constitution (1) the Congress is authorized to levy a tax and make appropriations for a comprehensive program of low-cost housing and slum clearance, and (2) whether the United States Government can exercise the right of eminent domain in order to carry out such program.

The power of taxation to provide for the general welfare specifically granted to the Congress in article 1, § 8, cl. 1, authorizes the carrying on of low-cost housing and slum-clearance projects, national in scope. This project is comprehensive and national in scope.[1] Funds raised by taxation were actually appropriated for this particular purpose.

At the time the Constitution was adopted this general welfare clause was understood to confer upon the Congress an independent and substantive power, ceded to it by the states, totally distinct from those conferred in the succeeding clauses of Article 1, § 8. 4 Jefferson's Correspondence, 524; 4 Hamilton's Works (Lodge Ed.), 151; Monroe, Views of the Presidents of the United States on the Subject of Internal Improvements, 2 American State Papers, Misc., 443, 446. See, also, Story on the Constitution (5th Ed.), § 913; Burdick on the Constitution, § 77, and Willoughby, United States Constitution, § 269.

It is only to the authority granted by this clause that much of the constructive legislation enacted by the Congress during the past one hundred years is referable. The Constitution made no provision for the

---

[1] Work on slum-clearance projects has been begun in Atlanta, Boston, Cleveland, Cincinnati, Chicago, Detroit, Indianapolis, Louisville, Milwaukee, Minneapolis, Montgomery, Nashville, New Orleans, New York City, Richmond, and Pittsburgh. Similar projects are planned for other cities.

Bureau of Education, the Department of Labor, the Department of Commerce, the Public Health Service, the Geological Survey, the Bureau of Mines, the Department of Agriculture, the Bureau of Fisheries, the Children's Bureau, the Smithsonian Institution, the Bureau of Standards. While certain of the activities of these departments or bureaus are authorized by the Constitution, as, for instance, the testing of weights and measures by the Bureau of Standards, there are many which relate to no other function specifically confided to the National Government by the Constitution, except that of providing for the general welfare through taxation. The Congress has continuously construed this clause as meaning that its power to tax and to make appropriations is not limited to the purposes set forth in the subsequent clauses of article 1, § 8, but includes the power to raise and appropriate money not "ad libitum" as pointed out by Jefferson (op. cit., supra) but to provide for the general welfare. This construction has prevailed too long and has been too uniform to be disregarded. McPherson v. Blacker, 146 U. S. 1, 36, 13 S. Ct. 3, 36 L. Ed. 869.

The individual states have power to enter into low-cost housing and slum-clearance projects within their borders. Green v. Frazier, Governor, 253 U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878. However, the police power is reserved to the states under the Tenth Amendment. "But it is none the less true that when the United States exerts any of the powers conferred upon it by the Constitution, no valid objection can be based upon the fact that such exercise may be attended by the same incidents which attend the exercise by a State of its police power, or that it may tend to accomplish a similar purpose." Hamilton, Collector, v. Kentucky Distilleries & Warehouse Co., 251 U. S. 146, 156, 40 S. Ct. 106, 108, 64 L. Ed. 194. Cf. Lottery Case, 188 U. S. 321, 357, 23 S. Ct. 321, 47 L. Ed. 492.

In Hoke v. United States, 227 U. S. 308, 33 S. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905, it was urged that the Act under review was an attempt to interfere with the police power of the states to regulate the morals of their citizens. The court, in 227 U. S. 308, at page 322, 33 S. Ct. 281, 284, says: "Our dual form of government has its perplexities, State and Nation having different spheres of jurisdiction, as we have said, but it must be kept in mind that we are one people; and the powers reserved to the States and those conferred on the Nation are adapted to be exercised, whether independently or concurrently, to promote the general welfare, material and moral."

Also the court said "but there is a domain which the States cannot reach and over which Congress alone has power; and if such power be exerted to control what the states cannot, it is an argument for—not against—its legality."

The problem of slum elimination throughout the nation lies within a domain which the individual states cannot reach and over which the Congress alone has power. This is an argument for—not against—the legality of this enactment so far as it constitutes an exercise of the taxing power to provide for the general welfare. Here the Congress, in my judgment, is exercising a power expressly conferred and ceded to it by the states in taxing and making appropriations for these purposes.

But the further question arises whether the power of eminent domain can be exercised in order to carry out these projects. The National Government possesses the power of eminent domain within the field prescribed for it by the Constitution. Article 1, § 8, cl. 1, gives the taxing power and the power of appropriation to the Congress. The power of eminent domain may be exercised wherever necessary and proper for carrying into execution the power of taxation and appropriation for the general welfare. The Fifth Amendment, however, prohibits the taking of private property for public use without just compensation, and therefore by implication requires that the power of eminent domain be exercised only in the taking of private property "for public use." The specific question is narrow in scope. It does not involve nor hint at the condemnation of farm land nor the operation of factories by the government. The question is whether a national low-cost housing and slum-clearance project involves a public use. In my opinion taxation and appropriation by the Congress are authorized under article 1, § 8, cl. 1, for low-cost housing projects to relieve unemployment so widespread as that which existed when this Act was passed, and this constitutes a public use. However, apart from the purpose declared in the statute, of creating nation-wide employment, this property is sought to be taken for a public use. Low-cost housing

and slum-clearance subserve a public purpose, and when national in scope, they fall within the constitutional powers of the National Government.

The slum is the breeding place of disease and crime.[2] Also slum clearance cannot be completely effected without low-cost housing. If disease and crime are to be rooted out of slum neighborhoods, the residents must be placed in homes which they can rent or buy. The wrecking of the rookeries must be followed by new and inexpensive housing.

The Congress has declared that this is a public use. A declaration so made will be respected by the courts unless the use be palpably without reasonable foundation. United States v. Gettysburg Electric Ry. Co., 160 U. S. 668, 680, 16 S. Ct. 427, 40 L. Ed. 576. That was a case involving not a declaration by a state legislature, but by the Congress, as in this case. The peculiar opportunity possessed by state legislatures for determining what is a public use within the state resides in the Congress with respect to determining what is a national public use when it acts, as here, within its constitutional powers.

The problem of housing is directly connected with the public morals. Its significance as bearing upon home environment is recognized by the United States Supreme Court in Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016. Since taxing to provide for the general welfare is one of the substantive powers of the Congress, the fact that national plans for low-cost housing may duplicate similar plans existing in the state does not affect the power. Hoke v. United States, supra.

No case precisely similar has been decided by the United States Supreme Court, which has wisely declined to lay down a rigid definition of public use. However, attention has repeatedly been called to the inadequacy of use by the general public as a universal test, and condemnation of private property, far less directly connected with the public good than these projects, has been held to involve a public use. In Clark v. Nash, 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171, condemnation of certain land was allowed for the irrigation of other land, belonging to one private individual. In Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174, condemnation of private land was allowed for the erection of an aerial tramway for one private corporation. Rindge Co. v. County of Los Angeles, 262 U. S. 700, 707, 43 S. Ct. 689, 693, 67 L. Ed. 1186, held that it is not essential that the entire community, nor even any considerable portion, should directly enjoy or participate in any improvement in order to constitute a public use, citing Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369, which decided that a public use existed in the irrigation of arid land privately owned.

The uses declared to be public include purposes much wider than the mere erection of public buildings or the physical enjoyment of property owned by the United States Government. In Mount Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., 240 U. S. 30, 32, 36 S. Ct. 234, 236, 60 L. Ed. 507, which involved the condemnation of land under statutes authorizing the manufacture and sale of electric power, the court states that

---

[2] Anti-social slum areas exist in New York, Chicago, Philadelphia, Richmond, Cleveland, Birmingham, Denver and Seattle, and other centers of population. "Despite the difference in character of these cities, their delinquency areas display similar characteristics—poor housing conditions; shifting and decreasing populations; great poverty and dependence; a marked absence of the home-owning class; a largely foreign population of inferior social status; unwholesome types of recreation; inadequate open-air play facilities." 1 Report on the Causes of Crime—National Commission on Law Observance and Enforcement—page LV, Report of Henry W. Anderson.

"Where slum clearance has been effected and the population rehoused in sanitary homes, a sharp decline in morbidity and mortality, as well as delinquency, has resulted. An excellent example is that of Liverpool. Rotten slums in the heart of the city inhabited by casual dock workers were destroyed and the buildings' replaced by new dwellings at low rentals. One clearance project restored 77 per cent. of its old population, and another 99 per cent. Yet among this same population after a short period in the new structures crime had decreased to less than 25 per cent. of its former incidence, death rates had dropped from 50 to 27 per thousand, tuberculosis from 4 to 1.9 per thousand, and other sickness accordingly." 14 American Enc. of Social Science, 95.

to draw energy from streams "and so to save mankind from toil that it can be spared, is to supply what, next to intellect, is the very foundation of all our achievements and all our welfare. If that purpose is not public, we should be at a loss to say what is." In Rindge Co. v. County of Los Angeles, supra, the court said: "Public uses are not limited, in the modern view, to matters of mere business necessity and ordinary convenience, but may extend to matters of public health, recreation and enjoyment."

It is true that these cases, with the exception of United States v. Gettysburg Electric Ry. Co., supra, involved state statutes; but in every case the question was squarely raised that the use involved in the condemnation was private; and every case held that a public use existed.

The power of condemnation by the state is to be considered in the light of the police power. The power of condemnation by the National Government is to be considered in the light of the express and independent power of the Congress to levy and collect taxes and make appropriations to provide for the general welfare. In the exercise of this specific power, the National Government may undertake those projects which benefit the health, the morals, and the general welfare of the people. One such project is the elimination on a comprehensive scale of the slum.

The judgment should be reversed.