**UNITED STATES et al. v. BOYLE, County Treasurer, et al.**

Civ. 21897.

District Court, N. D. Ohio.

Nov. 12, 1943.

Don C. Miller, U. S. Atty., and Jerome N. Curtis and Frank Steele, Asst. U. S. Attys., all of Cleveland, Ohio, and Thos. L. McKevitt, of Washington, D. C., for the government.

Thomas A. Burke, Jr., Director of Law, and Joseph F. Smith, Asst. Director of Law, both of Cleveland, Ohio, for the City of Cleveland.

Frank T. Cullitan, Pros. Atty., and Ralph W. Edwards, Asst. Pros. Atty., both of Cleveland, Ohio, for John J. Boyle and others.

Before ALLEN, Circuit Judge, and JONES and FREED, District Judges.

ALLEN, Circuit Judge.

The full court agrees that it has jurisdiction of the parties and of the subject matter of the litigation. Query v. United States, 316 U.S. 486, 62 S.Ct. 1122, 86 L.Ed.

1616. But since we do not unanimously agree that the real estate sought to be taxed by the taxing authorities is being devoted to a public use, it seems advisable to give this question a more formal consideration than that embodied in the findings of fact and conclusions of law.

The real estate involved in this controversy was acquired by the United States for a housing project through condemnation proceedings instituted by the Federal Emergency Administrator of Public Works, acting pursuant to the authority of Title II, §§ 201, 202 and 203 of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 200, 201, 202, 40 U.S.C. §§ 401, 402, 403, 40 U.S.C.A. §§ 401, 402, 403. These and related sections of the statute were held unconstitutional by the Court of Appeals for the Sixth Circuit in United States v. Certain Lands in City of Louisville, 78 F.2d 684, and by a District Court in United States v. Certain Lands in City of Detroit, 12 F.Supp. 345, upon the ground that such a taking was not for a public use and that the Congress is not authorized to appropriate money to promote the general welfare of even a great number of residents of the community in which the project was situated. While a writ of certiorari was filed to the decision in United States v. Certain Lands in City of Louisville, the case was dismissed upon motion by the Government prior to oral argument in the Supreme Court, for the reason that in forty-one of the slum-clearance projects existing throughout the nation the necessary land had been secured by negotiation, and in eight other cases, while condemnation proceedings were resorted to, no question had been raised as to the legality of the act. It therefore was concluded that the Louisville case as a practical matter had become moot. 130 A.L.R. 1069, 1072.

Thereafter the United States, first through the Federal Emergency Administrator of Public Works and later through the Federal Public Housing Authority, constructed on the land so acquired the buildings necessary for a low-cost housing slum-clearance project.

In 1937 the Congress enacted the so-called "United States Housing Act of 1937," 50 Stat. 888, 42 U.S.C. §§ 1401–1430, 42 U.S.C.A. §§ 1401–1430. This act created a Government corporation to be known as the United States Housing Authority, which was to function as an instrumentality of the United States in lending financial assistance to state and local housing agencies for the purpose of improving public housing conditions. In addition, § 1404(d) empowered the President to transfer to the Authority any right, interest or title held by any department or agency of the Federal Government in any housing or slum-clearance projects constructed or in process of construction on the date of the enactment of the act, and pursuant thereto the real estate in question was transferred to the Authority by Executive Order No. 7732, 42 U.S.C.A. § 1404 note, effective November 1, 1937. The property was thereafter leased to the Cleveland Metropolitan Housing Authority under the provisions of § 1412(b) and (d).

The principal legal question in the case is whether property so acquired may, under the restrictions of the United States Constitution, be used by the United States for low-cost housing and slum-clearance. It is contended that the employment by the Federal Government of real estate for the purposes described does not constitute a public use, and hence does not fall within the powers of the Federal Government.

With reference to the constitutionality of the United States Housing Act of 1937, which is attacked here, the question is an open one. The previous decisions in this circuit which rule upon a similar question apply only to the housing and slum-clearance provisions of the National Industrial Recovery Act, 40 U.S.C. § 401 et seq., 40 U.S.C.A. § 401 et seq. Moreover, in Helvering v. Davis, 301 U.S. 619, 640, 672, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319, the Supreme Court squarely overruled the doctrine relied upon for those decisions, and held that Congress has the power to impose a tax and appropriate money for the general welfare. Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293; United States v. Butler, 297 U.S. 1, 65, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. Under these pronouncements the Court of Appeals for the Sixth Circuit, in Bastian v. United States, 118 F.2d 777, decided that a resettlement project established under the authority of the Emergency Relief Appropriation Act of April 8, 1935, c. 48, 49 Stat. 115, was valid. Substantially the same contentions as are urged against the constitutionality of the present projects were presented in that case and overruled.

Under the recent decisions of the Supreme Court, it is significant that the stated

purpose of the act under consideration is much broader than the purpose of the emergency housing sections of the National Industrial Recovery Act, 40 U.S.C. § 403(a), 40 U.S.C.A. § 403(a), which declared that the provisions in question were enacted "with a view to increasing employment quickly (while reasonably securing any loans made by the United States) * * *." The purpose of the 1937 statute is announced in the body of the act, as follows:

Title 42 U.S.C. § 1401, 42 U.S.C.A. § 1401. "It is hereby declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation."

It not only is no longer an open question that Congress has power to appropriate money to promote the general welfare, but the determination of the Congress that the projects are in furtherance of the general welfare is decisive, unless arbitrarily made and clearly wrong. Helvering v. Davis, supra, 301 U.S. 640, 641, 57 S.Ct. 904, 908, 81 L.Ed. 1307, 109 A.L.R. 1319. Here there is nothing to show that the legislative choice is clearly wrong. While it is true that in former periods of our history such projects might not have been necessary for the general welfare, it is also true, as stated in Helvering v. Davis, supra, that "Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the nation." Despite the difference in character of the slum areas existing in different parts of the country, as was found by the National Commission on Law Observance and Enforcement in its First Report on the Causes of Crime, the delinquency areas in these cities "display similar characteristics—poor housing conditions; shifting and decreasing populations; great poverty and dependence; a marked absence of the home-owning class; a largely foreign population of inferior social status; unwholesome types of recreation; inadequate open-air play facilities." On the other hand, it is a matter of wide-spread knowledge that slum-clearance is a direct remedy for the insanitary, unhealthful conditions that arise out of the crowding and filth of the slum areas. Where old tenements are torn down, and replaced by new, clean, healthful buildings, open to light and air, there is a sharp decline in disease and delinquency. In Liverpool one such slum-clearance project regained 77% of the old population, and another 99%. Yet after a short period crime had decreased among these same residents to less than 25% of the former figure, tuberculosis dropped from 4 to 1.9 per thousand, and the death rate dropped from 50 to 27 per thousand. 14 American Enc. Social Science, 95.

The problem of eliminating the slum throughout the country is national in scope and lies within a domain which the individual States cannot reach, and over which the Congress alone has power.

The individual States have long been held to have power to enter into such projects within their borders. Green v. Frazier, 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878. In such cases the power was upheld on the ground of public use, and we think the same considerations compel a similar conclusion here. The fact that private individuals receive direct benefit from these projects does not deprive the public of their use. The public, after all, is merely an aggregation of private individuals. Public schools, public universities, public parks, and many similar governmental institutions and projects which offer definite public benefit extend peculiar benefit to those who have immediate access to them. Direct use by the general public is not essential. Strickley v. Highland Boy Mining Co., 200 U.S. 527, 531, 26 S.Ct. 301, 50 L.Ed. 581, 4 Ann.Cas. 1174. Nor does the use fail to be public upon the ground that the immediate enjoyment of it is limited to a small group or even to a single person. Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 161, 17 S.Ct. 56, 41 L.Ed. 369; Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., 240 U.S. 30, 32, 36 S.Ct. 234, 60 L.Ed. 507; Rindge Co. v. County of Los Angeles, 262 U.S. 700, 707, 43 S.Ct. 689, 67 L.Ed. 1186.

We think that a project so closely connected with the public health, safety and morals of the citizens of the nation as the abolition on a national scope of the slum, plainly constitutes a project of public use, and is authorized under the Constitution

of the United States. Oklahoma City v. Sanders, 10 Cir., 94 F.2d 323, 115 A.L.R. 363. Cf. Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 130 A.L.R. 1053.

For these reasons, as well as those stated in the findings of fact and conclusions of law, it follows that the injunction prayed for is allowed.

JONES, District Judge (dissenting).

I agree that property held by the United States, and employed by it in the execution of its constitutional powers and functions, may be held exempt from State taxation; but I think that in holding this property in the name of an instrumentality of the United States, for the use of special or selected classes of people, or specially selected groups, and with the intention to lease, and leasing it, to a State-created proprietary agency, is not such a governmental function or purpose as to permit its exemption from State, County or Municipal taxation. In such circumstances as presented here, I am of the opinion that the lands were not acquired and are not held for a governmental function or purpose within the right of constitutional sovereignty. I think title and use both are essential in testing the right to tax exemption of property held by the sovereign. If title only is the test, constitutional limitations are without meaning.

It will be noted that Mr. Justice Gray, in writing the opinion for the court in Van Brocklin v. State of Tennessee, 117 U.S. 151, 6 S.Ct. 670, 29 L.Ed. 845, (relied upon so strongly by the Housing Authority), repeatedly and consistently refers to tax exemption of property of the United States used for governmental functions or purposes. In that case, the property was acquired and held by the United States to enforce and liquidate a tax lien, and this it seems to me was in furtherance of the governmental function of protecting and preserving its revenues. Thus, as I think, property held by the United States, or by an instrumentality of the Federal government, only may be exempt from taxation by a State, County or City in which the property is situated, where the property is devoted to or used for a governmental function or purpose.

No matter how desirable slum clearance and low-cost housing may be, it is not in my opinion such a Federal function as to permit exemption of the property used therefor from State taxation. On the contrary, it consistently has been held that the power of the States to protect the lives, health and property of their citizens, and to preserve good order and public morals, is a power originally and always belonging to the States and not surrendered by them to the general government. Cooley, Principles of Constitutional Law. If the Federal government may acquire and hold property free from State taxation and devote it to any use or purpose not related to governmental functions, there is no limitation of Federal power over State sovereignty. Such right is not implicit in Federal sovereignty, nor is it express or to be implied in the provisions of the Federal Constitution. I think the property involved in this case is subject to the taxes assessed.

Considering the matter from another aspect, what has been done to impair State sovereignty, simply stated, is this: the Federal government has acquired this property and holds it through its agency, the Housing Authority, for the purpose of furnishing low-cost housing to special groups or classes of inhabitants. This certainly is a private use of the land. The State, County and City furnish benefits and services to these residents just as they furnish services, facilities and benefits to other residents. Thus to require the State to give services and protection to this property, and deprive it of its revenues to be used for such purposes, without making any substantial or adequate provision to compensate for such loss of revenues, seems to me to be contrary to all sense of Federal or Constitutional right,—a dangerous denial of State sovereignty.