Frank E. MIDKIFF et al., Plaintiffs,

v.

Paul A. TOM et al., Defendants,

and

Wai-Kahala Tract "H" Association, Inc., et al., Intervenors.

Civ. No. 79–0096.

United States District Court, D. Hawaii.

May 8, 1979.

Clinton R. Ashford, Ashford & Wriston, Rosemary T. Fazio, Honolulu, Hawaii, G. Richard Morry, Hamilton, Gibson, Nickelsen, Rush & Moore, Earl T. Sato, Honolulu, Hawaii, for plaintiffs.

Rick Tsujimura, Allen Kawada, Deputy Attys. Gen., Wayne K. Minami, Atty. Gen., State of Hawaii, Hawaii State Capitol, Honolulu, Hawaii, for defendants.

Dennis E. W. O'Connor, James K. Tam, John Francis Perkin, David A. Nakashima, Hoddick, Reinwald, O'Connor & Marrack, Honolulu, Hawaii, for intervenors, Wai-Kahala Tract H. Ass'n, Inc., et al.

James H. Case, A. Bernard Bays, Carlsmith, Carlsmith, Wichman & Case, Honolulu, Hawaii, for intervenors, Kahala Community Ass'n, Inc. and Kahala Community Ass'n Fee Purchase Fund.

Thomas T. Watts, Kemper & Watts, Honolulu, Hawaii, for intervenors Halawa Valley Estates Fee Conversion Corp.

## DECISION ON MOTION FOR PRELIMINARY INJUNCTION

SAMUEL P. KING, District Judge.

The Trustees of the Estate of Bernice Pauahi Bishop[1] filed suit in this court on February 28, 1979, against the Commissioners and Executive Director of the Hawaii Housing Authority[2] and the Hawaii Housing Authority[3] itself, praying for a declaration that the Hawaii Land Reform Act[4] be declared unconstitutional.

---

1. Plaintiffs refer to themselves as "Trustees of the Kamehameha Schools/Bishop Estate." The Kamehameha Schools were established in accordance with the wishes of Princess Bernice Pauahi Bishop as expressed in her will. The named plaintiffs are trustees under the will and of the estate of Bernice Pauahi Bishop, deceased, appointed as such by the Supreme Court of Hawaii. *See Kekoa v. Supreme Court,* 55 Haw. 104, 516 P.2d 1239 (1973), *cert. denied, sub nom. Kekoa v. Richardson,* 417 U.S. 930, 94 S.Ct. 2641, 41 L.Ed.2d 233 (1974). The testamentary trust is commonly referred to as the Bishop Estate.

2. The Commissioners and Executive Director are sued in their individual and official capacities.

3. The Hawaii Housing Authority is "a public body and a body corporate and politic with perpetual existence" which is "placed within the department of social services and housing for administrative purposes." Haw.Rev.Stat. § 356–5(a) (1976). The authority is charged generally with the duty of carrying out the State's responsibilities under state and federal statutes with respect to housing. Haw.Rev. Stat. § 356–7 (1976).

4. 1967 Haw.Sess.Laws Act 307, as amended by 1968 Haw.Sess.Laws Act 46, 1969 Haw.Sess. Laws Act 203, 1971 Haw.Sess.Laws Act 215, 1972 Haw.Sess.Laws Act 2, 1975 Haw.Sess. Laws Acts 184, 185, and 186, 1976 Haw.Sess. Laws Acts 159, 200, and 242, and 1978 Haw. Sess.Laws Act 140. These acts are set forth in

A temporary restraining order against implementation of mandatory arbitration was granted pending a hearing and decision on a preliminary injunction.[5] That hearing was held on April 24–27, 1979.

Motions to intervene were filed by several Bishop Estate lessee organizations.[6] All motions were granted on March 23, 1979.

At this stage of the proceedings, the evidence adduced and arguments presented concentrated on the facial constitutionality of Chapter 516 of the Hawaii Revised Statutes.[7] Some evidence related to the actual application of the law, but this was limited to setting the context within which the law was supposed to operate.[8] For purposes of the hearing, it was agreed that the court could take as true the legislative findings set forth from time to time when this and related laws were enacted or amended.[9]

Chapter 516 authorizes the use of the State's power of eminent domain to permit

---

Haw.Rev.Stat. ch. 516 (1976). *See also*: Haw. Rev.Stat. ch. 519 (1976). Plaintiffs attack specifically the provisions of § 516–1(14) (defining "owner's basis"), §§ 516–22 to 24 (authorizing condemnation), and §§ 516–51 to 55 (providing for mandatory arbitration).

5. A temporary restraining order was issued on February 28, 1979, in the form requested by plaintiffs. Upon reflection, I determined that this order was too broad. At a subsequent conference with counsel, I announced *sua sponte* that I would modify this order to make it clear that steps preliminary to arbitration were not enjoined. The Order Modifying Temporary Restraining Order was entered on March 27, 1979. By stipulation between plaintiffs and (then) defendants dated February 28, 1979, and entered as an order of the court on March 2, 1979, the expiration date of the temporary restraining order was extended from March 10, 1979, to March 14, 1979. A further extension from March 14, 1979, to April 24, 1979, was similarly stipulated to on March 7, 1979, and entered as an order of the court on March 9, 1979. A motion filed on March 20, 1979, by the O'Connor Intervenors to dissolve the temporary restraining order or in the alternative for security in the amount of $1,000,000 was denied on March 27, 1979. A motion filed on March 20, 1979, by the Bays Intervenors to modify the temporary restraining order was in effect denied on March 27, 1979, by the court's *sua sponte* modification in different language.

6. On March 7, 1979, by WAI–KAHALA TRACT H ASSOCIATION, INC.; HALAWA HILLS LANDSALE COMMITTEE; AWAKEA ASSOCIATION; ALII SHORES COMMUNITY ASSOCIATION; ENCHANTED HILLS, UNIT I; PORTLOCK COMMUNITY ASSOCIATION (MAUNALUA BEACH); KOKOHEAD COMMUNITY LEASE–FEE, INC.; WEST MARINA COMMUNITY ASSOCIATION; KALAMA VALLEY COMMUNITY ASSOCIATION; MAUNALUA TRIANGLE–KOKO KAI COMMUNITY ASSOCIATION, INC.; HAHAIONE VALLEY COMMUNITY ASSOCIATION, INC.; KAMILOIKI COMMUNITY ASSOCIATION; LUNALILO MARINA COMMUNITY ASSOCIATION; MARINERS RIDGE AND COVE FEE/LEASE CONVERSION COMMITTEE; SPINNAKER ISLE ASSOCIATION; WAIA-LAE–IKI COMMUNITY ASSOCIATION; and WAIAU COMMUNITY ASSOCIATION, all represented by Hoddick, Reinwald, O'Connor & Marrack, hereinafter sometimes referred to as the O'Connor Intervenors.

On March 8, 1979, by KAHALA COMMUNITY ASSOCIATION, INC.; and KAHALA COMMUNITY ASSOCIATION FEE PURCHASE FUND, represented by Carlsmith, Carlsmith, Wichman and Case, hereinafter sometimes referred to as the Bays Intervenors.

On March 12, 1979, by HALAWA VALLEY ESTATES FEE CONVERSION CORPORATION, represented by Kemper & Watts, hereinafter sometimes referred to as the Watts Intervenor.

7. It was not deemed appropriate to attempt to consolidate the hearing on the preliminary injunction with the hearing on the merits, as all parties desired to engage in extensive discovery. While much discovery can probably be avoided by pretrial conferences with the court, certain basic constitutional issues can be addressed immediately on stipulated facts with only limited testimony.

8. The Bishop Estate is an eleemosynary testamentary trust. The statute in question applies in terms to "all lands leased as residential lots which are owned or held privately or owned by the State or its political subdivisions, except Hawaiian home lands . . . and lands owned or held by the federal government." Haw.Rev.Stat. § 516–2 (1976). For purposes of this hearing, no distinction is made as to the power of the legislature to legislate with respect to the land holdings of a perpetual eleemosynary trust as opposed to the land holdings of private individuals.

9. Especially, the legislative findings in 1967 Haw.Sess.Laws Act 307 § 1, 1975 Haw.Sess. Laws Act 184 § 1, and 1975 Haw.Sess.Laws Act 186 §§ 1 and 2. 1975 Haw.Sess.Laws Act 186 § 2 is set forth in Haw.Rev.Stat. § 516–83 (1976). For the language of these findings, *see* note 21, *infra.*

lessees of residential lots to acquire the fee simple title to their homes.[10] The Hawaii Housing Authority is given the power and duty to carry out the provisions of this chapter.[11] The Authority established the position of Land Reform Administrator to handle this function and adopted regulations implementing the statute.[12]

The Trustees object to the application of this land reform statute to the Bishop Estate lands on three principal grounds. First, they say that the State's power of eminent domain cannot constitutionally be used for the intended purpose in that the benefits derived from such use inure solely to private individuals.[13] Second, they say that the statute unconstitutionally mandates less than fair market value as compensation for the taking of the owner's leased fee interests.[14] Third, they say that

10. Haw.Rev.Stat. §§ 516–21 to 45 (1976).

11. Haw.Rev.Stat. §§ 516–6 and 7 (1976).

12. Rule 10 of the Department of Social Services and Housing, Hawaii Housing Authority, State of Hawaii, approved by Governor John A. Burns on November 1, 1968, after a public hearing as required by Haw.Rev.Stat. ch. 6C (1955) (now Haw.Rev.Stat. ch. 91 (1976)), and subsequently amended to reflect statutory changes. The present AMENDED RULE 10 is entitled: A REGULATION PERTAINING TO THE HAWAII HOUSING AUTHORITY OF THE DEPARTMENT OF SOCIAL SERVICES AND HOUSING, IMPLEMENTING ACT 307, SESSION LAWS OF HAWAII, 1967, AS AMENDED BY ACT 46, SESSION LAWS OF HAWAII, 1968; ACT 203, SESSION LAWS OF HAWAII, 1969; ACT 215, SESSION LAWS OF HAWAII, 1971; ACT 2, SESSION LAWS OF HAWAII, 1972; ACT 184 AND ACT 186, SESSION LAWS OF HAWAII, 1975; AND ACT 242, SESSION LAWS OF HAWAII, 1976.

13. Haw.Rev.Stat. § 516–30 (1976) provides for the sale to a lessee by the Hawaii Housing Authority of the leased fee interest to the lot leased by the lessee after the authority has acquired that leased fee interest. The lessee must qualify pursuant to Haw.Rev.Stat. § 516–33 (1976) and meet certain other requirements. This purpose of the law is spelled out in Haw. Rev.Stat. § 516–83(5) (1976) in the following language:

The acquisition of residential land in fee simple, absolute or otherwise, at fair and reasonable prices by people who are lessees under long-term leases of such land and on which such land their homes are situated and the ability of such people to fully enjoy such land through ownership of such land in fee simple will alleviate these conditions [set forth in preceding subparagraphs] and will promote the economy of the State and public interest, health, welfare, security, and happiness of the people of the State.

If a lessee fails to purchase his leased lot, the authority becomes the lessor, subject to all the provisions of law applicable to lessors. Haw. Rev.Stat. §§ 516–30 and 31 (1976). Presumably the authority will not exercise its power to acquire a lessor's leased fee interest unless suf-

ficient activity by lessees has taken place pursuant to Haw.Rev.Stat. § 516–22 (1976) and unless sufficient assurances of purchase by lessees have been received in the form of contracts to purchase as contemplated by Haw. Rev.Stat. § 516–30 (1976) and AMENDED RULE 10 § 17.

14. 1967 Haw.Sess.Laws Act 307 provided in § 13 for payment upon condemnation of "the current fair market value of the tract diminished by the lessees' interests in the leased lots within the tract." A "lessee's interest" or "leasehold interest" was defined in § 2(h) to mean "the current fair market value of all on-site improvements, including all landscaping, walks, drives, walls, fences, buildings and betterments on the surface of the lot, paid for or required to be paid for by the lessee, plus the unamortized current replacement cost of all off-site improvements paid for or required to be paid for by the lessee, determined on the basis of current costs of installation of the same off-site improvements under the circumstances existing at the time of the original installation, and computed on a straight-line basis over the period of the lease, together with the lessee's value increment . . . .." The "lessee's value increment" was defined in § 2(i) to mean "the value of his interest in the residential use, enjoyment and amenities of the lot during the balance of the unexpired term of the lease, computed notwithstanding any provision to the contrary in the lease or any other contract; provided that such value shall in no event be less than ten per cent nor more than 15 per cent of the current fair market value of the unencumbered fee of the lot."

1968 Haw.Sess.Laws Act 46 in § 2e redefined the "compensation to be paid for the development tract" of Act 307 § 13 to be "the current fair market value of the tract, valued as if the fee title to the tract were unencumbered and the tract were undeveloped and unsubdivided, plus the unpaid balance owing to the lessor by lessees of the lots in the tract as reimbursement for the actual offsite improvement costs paid for by the lessor; provided, that in no event shall the compensation be less than the sum of the present worth of the future rental income stream under the leases to lots in the tract and the present worth of the lessor's re-

the compulsory arbitration provisions of the statute violate constitutional guarantees.[15]

■ In making a preliminary determination of these issues at this time, I am governed by the test enunciated in *Aguirre v. Chula Vista Sanitary Service*,[16] that is, that a preliminary injunction should issue " 'upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting preliminary relief.' "[17] I shall analyze each of the listed objections in the light of this teaching from *Aguirre.*

■ First, I am of the opinion that the State may use the power of eminent domain to redefine, rearrange, or redistribute interests in land.[18] Throughout recorded

---

versionary interest in the leased lots." This act also, in § 2b and c, deleted the earlier definitions of "lessee's interest" and "lessee's value increment" and substituted a definition of "offsite improvements" to mean "all physical improvements such as, but not limited to, roads, sewer lines, sewage treatment plants, and underground electric cables, constructed or placed in a subdivision off the lots intended for occupancy, which improvements are to be used in common by occupants of all lots adjoining such improvements or by occupants of all lots for whose benefit the improvements have been constructed or placed."

1975 Haw.Sess.Laws Act 184 again changed the provisions of Act 307 relating to compensation. Haw.Rev.Stat. § 516–24 (Act 307 § 13) was amended to provide that the "compensation to be paid for the leased fee interest in a residential houselot within a [development] tract shall be the owner's basis as defined in section 516–1(14)." "Owner's basis" was a new definition added to Act 307 § 2. This was defined as "the current fair market value of the lot excluding onsite improvements, valued as if the fee title were unencumbered, less the lessee's share, if any, of the current replacement cost of providing existing offsite improvements attributable to the lot, which replacement cost shall include an overhead and profit not exceeding twenty percent of the current replacement cost of the existing offsite improvements, or the original lot development credit to the lessee, whichever is greater, plus the unpaid balance, if any, owing to the lessor by the lessee as reimbursement other than as a part of the lease rent for the actual offsite improvement costs paid by the lessor." The definition of "offsite improvements" was expanded to make it explicit that "gutters, curbs, sidewalks, fire hydrants, street lights, land dedicated for public purposes" were included.

1976 Haw.Sess.Laws Act 242 made the final changes with which we are now concerned. "Owner's basis" was redefined as "the current fair market value of the lot." The definition then went on to provide that the "fair market value shall be established to provide the lessor with just compensation for his interests in the lot and shall take into consideration every interest and equity of the lessee in establishing that market value." The definition continued with language which on its face seems to mandate that this value "shall be determined by whichever following method provides just compensation and gives the greater consideration to the lessee's interest" and sets forth a method "(A)" (a discounted future rental income stream plus a discounted lessor's reversionary interest) and a method "(B)" (current market value less the lessee's interests). This act also provides for mandatory arbitration of compensation in advance of condemnation and that the "effect of the arbitration award and all matters relating thereto shall be prima facie evidence as to just compensation in any condemnation proceedings under this chapter." *See* note 24 *infra.*

15. Compulsory arbitration appears for the first time in 1976 Haw.Sess.Laws Act 242 § 4, adding a new Part IIA to Haw.Rev.Stat. ch. 516 entitled "MANDATORY ARBITRATION OF COMPENSATION" and consisting of five sections. Arbitration is instituted by the Hawaii Housing Authority if voluntary negotiations fail. In this event, assuming the required number of qualified lessees have applied to the authority to purchase the leased fee interest in their residential leasehold lots, "the Hawaii housing authority shall direct the lessor and lessee to submit to mandatory arbitration under chapter 658 [Hawaii's statute on agreements to arbitrate] to establish an amount of just compensation which shall be paid to lessor for the lessor's leased fee interest under section 516–24."

It is interesting to note that the House bill which ended up as Act 242 did not mention arbitration, the Senate amended to provide for arbitration by agreement, and the conference committee reported out a bill with the existing mandatory arbitration provisions.

16. 542 F.2d 779 (9th Cir. 1976).

17. *Id.* at 781.

18. *See Clark v. Nash*, 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed.2d 1085 (1905) (upholding statutory authority given an individual in Utah to condemn an easement across another individual's land for the purpose of enlarging an irrigation ditch serving the condemnor's land);

history, the manner in which land is permitted to be held and used has been of critical importance to all members of a given society.[19] It is not enough to acquiesce in legislation that looks only to the future. The

ingenuity of man could postpone the future to an unacceptable remoteness in time.[20]

■ Furthermore, the legislature has defined the public interest and the public purpose behind Chapter 516.[21] Whether or

*Strickley v. Highland Boy Gold Mining Co.,* 200 U.S. 527, 26 S.Ct. 301, 50 L.Ed. 581 (1906) (upholding statutory authority given a mining corporation in Utah to condemn a right of way for an aerial bucket line across a placer mining claim of another individual); *Mt. Vernon Cotton Co. v. Alabama Power Co.,* 240 U.S. 30, 36 S.Ct. 234, 60 L.Ed. 507 (1916) (upholding statutory authority given a power company in Alabama to condemn private property for its purposes); *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (upholding the District of Columbia Redevelopment Act of 1945); *People of Puerto Rico v. Eastern Sugar Associates,* 156 F.2d 316 (1st Cir. 1946), *cert. denied,* 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664 (1946) (upholding Puerto Rico's statutory program for redistribution of land based on the territory's power of eminent domain); *Government of Guam v. Moylan,* 407 F.2d 567 (9th Cir. 1969) (upholding Guam's urban redevelopment statute).

**19.** *See Public Land Policy in Hawaii: Major Landowners,* Legislative Reference Bureau, State of Hawaii, Report No. 3 (1967); *Public Land Policy in Hawaii; An Historical Analysis,* Legislative Reference Bureau, State of Hawaii, Report No. 5 (1969); *Green v. Frazier,* 44 N.D. 395, 176 N.W. 11 (1920), *aff'd,* 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878 (1920).

**20.** *See* 3 J. REEVES, HISTORY OF THE ENGLISH LAW 324–25 (2d ed. 1787).

**21.** 1975 Haw.Sess.Laws Act 186 § 2 (Haw.Rev. Stat. § 516–83). The section reads as follows: Legislative findings and declaration of necessity; purpose. (a) The legislature finds that:
(1) There is a concentration of land ownership in the State in the hands of a few landowners who have refused to sell the fee simple titles to their lands and who have instead engaged in the practice of leasing their lands under long-term leases;
(2) The refusal of such landowners to sell the fee simple titles to their lands and the proliferation of such practice of leasing rather than selling land has resulted in a serious shortage of fee simple residential land and in an artificial inflation of residential land values in the State;
(3) Due to such shortage of fee simple residential land and such artificial inflation of residential land values, the people of the State have been deprived of a choice to own or take a lease of the land on which their homes are situated and have been required instead to accept long-term leases of such land which contain terms and conditions that are finan-

cially disadvantageous, that restrict their freedom to fully enjoy such land and that are weighted heavily in favor of the few landowners of such land;
(4) The economy of the State and public interest, health, welfare, security, and happiness of the people of the State are adversely affected by such shortage of fee simple residential land and artificial inflation of residential land values and by such deprivation of the people of the State of the choice to own or take a lease of the land on which their homes are situated and the required acceptance of such long-term leases of such lands;
(5) The acquisition of residential land in fee simple, absolute or otherwise, at fair and reasonable prices by people who are lessees under long-term leases of such land and on which such land their homes are situated and the ability of such people to fully enjoy such land through ownership of such land in fee simple will alleviate these conditions and will promote the economy of the State and public interest, health, welfare, security, and happiness of the people of the State;
(6) The cost of living in Hawaii is and has been high. In recent years inflation has drastically increased the cost of living in the State. The spiraling cost of living affects all people through erosion of the purchasing power of whatever monetary resources they command. For a growing proportion of Hawaii's population, quite possibly a majority, the high cost of living is denying them such basic necessities as sufficient nutritional intake, safe and healthy housing accommodations, clothing, and adequate preventive and curative health services. A substantive and significant contributing factor to the high and rising cost of living is the high cost of land whether leasehold or fee. Stabilizing the costs of land or, at least, slowing the artificial inflation of land values would curb the rising cost of living in Hawaii and, ultimately, contribute to the welfare of all people of the State by improving their standard of living.
(7) The Constitution of the State of Hawaii provides the State the power to provide assistance for persons unable to maintain a standard of living compatible with decency and health. The rising cost of land tied to other cost of living increases is swelling the ranks of those persons unable to maintain a decent and healthful standard of life. If the inflationary trend of land continues unchecked, the resultant inflationary total cost of living could create such a large population

not the prohibition of the Fourteenth Amendment against depriving any person of property without due process of law is the same as the prohibition of the Fifth Amendment against the taking of private property for public use without just compressing public necessity for a secure, strong and stable economy.

of persons deprived of decent and healthful standards of life that the consequent disruptions in lawful social behavior could irreparably rend the social fabric which now protectively covers the life and safety of all Hawaii's people. The threat posed by this possibility is sufficiently real and imminent to warrant State action to redistribute land as a means of curbing continuing inflationary rises in land values.

(8) The right to own land is not an irrevocable grant of a special privilege where it operates against the general welfare of the many for the particular benefit of the few.

(9) Land, in common with other natural resources, is of finite quantity; a fact particularly obvious in Hawaii. In recent decades there has been growing general agreement that the wise conservation, preservation, use and management of exhaustible natural resources such as land are matters mandating an active governmental role. There is an intimate relationship between the monetary values accorded land in Hawaii and the stability and strength of the State's economy as a whole. Land values, artificially inflated by the high concentration of ownership, skew the State economy toward unnecessarily high levels. The pervasive and substantial contribution made to inflation by high land values creates a potential for economic instability and disruption. Economic inflation, instability and disruptions have real and potential damaging consequences for all members of an affected society. Checking inflation, improving the stability of the economy, and forestalling disadvantageous economic disruptions all are productive of general benefit to all members of the Hawaiian society. The sound and wise conservation, preservation, use and management of land cannot be separated from the subject of patterns of land ownership. To accomplish the public purposes of wisely conserving, preserving, using, and managing the land in the State requires changing present patterns of land ownership. Public laws, expenditures, programs, and policies which contribute to the realization of these public purposes serve a public use since they ultimately benefit the entire community. Changing present patterns of land ownership by allowing lessees under long-term leases of residential land to purchase in fee simple, absolute or otherwise, the land on which their homes are situated, through governmental intervention including exercise of the power of eminent domain to acquire fee simple title to such land and public financing of such purchase and such condemnation and payment through the issuance of bonds, the expenditure of general revenue funds, and the use of private funds which are at the disposal of the State, will help satisfy the

(10) The State's acquisition of residential lands held in fee simple, through the exercise of the power of eminent domain, for the purposes of this [chapter] is for the public use and purpose of protecting the public safety, health and welfare of all people in Hawaii.

(11) Inflation lessens the quality of life of all members of this afflicted society and is particularly invidious in its impact on the 90 plus per cent of the population who are in the poverty, and low through middle income groups. The State has limited abilities to curb inflation and, perhaps, the only useful means available is the State's power to control land values. There is a pressing public necessity for the State to do whatever it can to curb inflation and to keep the cost of living at a level where it is possible and manageable to provide all citizens a decent and healthful standard of life. The public use and purpose of providing all citizens a decent and healthful standard of life will be directly and substantially furthered by the State's acquisition of residential lands held in fee simple, through the exercise of the power of eminent domain, for the purposes of this [chapter].

(12) The use of the power of eminent domain to condemn the fee simple title to residential land and the payment of just compensation therefor for the purpose of making the fee simple title thereto and the use thereof available for acquisition by people who are lessees under long-term leases of such land and on which such land their homes are situated is for a public use and purpose;

(13) Legislation providing to people who are lessees under long-term leases of residential land on which their homes are situated the ability to fully enjoy such land through ownership of such land in fee simple, absolute or otherwise, is for a public purpose.

(b) It is therefore declared to be necessary and it is the purpose of this chapter to alleviate the conditions found in subsection (a) of this section by providing for the right of any person who is a lessee under a long-term lease of residential land in the State to purchase at a fair and reasonable price the fee simple title to such land, by providing for the condemnation of the fee simple title to such land and the payment of just compensation therefor by the State through the use of the power of eminent domain and by providing for the public financing of such purchase and such condemnation and payment through the issuance of bonds, the expenditure of general revenue funds, and the use of private funds which are at the disposal of the State.

1967 Haw.Sess.Laws Act 307 § 1 set forth the first legislative findings in this area as follows:

Findings and declaration of necessity. The legislature finds that:

(a) A prime goal in the United States is the promotion of the public welfare and the securing of liberty as enunciated in the Constitution of the United States through the attainment of fee simple ownership of residential lots by the greatest number of people. Article I, section 2 of the State Constitution recognizes this goal when it states:

"All persons are free by nature and are equal in their inherent and inalienable rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possessing of property . . ."

(b) During the past few years, Hawaii's economy has expanded greatly and its population has grown rapidly. Concomitantly, the demand for single-family residential lots, especially in the urban areas of the State where the population growth has been concentrated, has increased sharply.

(c) The present-day land ownership system in the State is characterized by a concentration of the fee title to lands in the hands of a few. In the days of the Hawaiian monarchy, all of the lands were held by the Hawaiian kings and chiefs and a few of their faithful followers. While the concentration of ownership of land in the hands of a few may have been well-suited to the needs of the people in the days of the monarchy, it is hardly suited to the needs of the people in modern Hawaii. Yet, the pattern of concentration of land ownership in the hands of a few has remained essentially unchanged since the days of the monarchy. Today, land ownership is centered not in the monarchical government, but in the hands of a few estates, trusts and other private landowners. At least three-fourths of all privately held land in the State are currently owned by this small group of owners. Much of this land is in the rapidly developing urban areas of the State, where the need for single-family residential lots is critical.

(d) This critical shortage of land has led large landowners to enter into complex arrangements, such as development contracts, master leases, participating leases, subleases and leases with developers. The term and conditions of these arrangements were at that time heavily weighted in favor of the lessors or fee owners against the developers and those who participated in the development or share in the lease rentals. Neither did the participants in the private arrangements or contracts or leases contemplate, at that time, the wholesale condemnation of private leased residential lots by the State as provided in this act.

(e) The few landowners have, over the years, permitted some of their urban lands to be developed into single-family residential lots. However, because of restrictive indentures in instruments creating the various trusts and estates, and because of income taxation problems, the landowners have generally engaged in the practice of leasing, rather than selling in fee simple, the residential lots developed on their lands.

(f) The population growth and the increase in demand for residential lots, and the concentration of ownership of private lands in the hands of a few and their practice of leasing, rather than selling in fee simple, the residential lots developed on their lands, have led to a serious shortage of residential fee simple property at reasonable prices in the State's urban areas and have deprived the people of the State of a choice to own or to take leases to the land on which their homes are situated.

(g) The shortage of single-family, residential, fee simple property, and the restriction on the people of a real choice between fee simple and leasehold residential property have in turn caused land prices for both fee simple and leasehold residential lots to become artificially inflated and have enabled lessors to include in residential leases terms and conditions that are financially disadvantageous to the lessees, restrict unduly their freedom to enjoy their leasehold estates and are weighted heavily in favor of the landlord as against the lessees.

(h) In the next twenty years, it appears that the few, large landowners will continue to permit the development of leasehold, rather than fee simple, residential lots in counties exceeding 100,000 persons in population, unless legislation is enacted to reverse this trend.

(i) Even when the provisions providing for purchase of the fee simple title of residential lots by lessees or the State as provided in this act become effective, neither the lessees nor the State can possibly acquire all leasehold lands. Thus, many of the over 16,000 leasehold contracts now in existence and future leases will remain outstanding, and the economic facts stated above indicate clearly that lessees require certain statutory protection of their fundamental rights to bargain and to otherwise preserve their equitable and legal interests.

(j) The dispersion of ownership of fee simple residential lots to as large a number of people as possible, the ability of the people to acquire fee simple ownership of residential lots at a fair and reasonable price and the ability of lessees of residential leases to derive full enjoyment from their leaseholds are factors which vitally affect the economy of the State and the public interest, health, welfare, security and happiness.

Relevant legislative findings are also found in 1975 Haw.Sess.Laws Act 184 § 1, Act 185 § 1, and Act 186 § 1 as follows:

## ACT 184 FINDINGS
## AND PURPOSE

The legislature reaffirms its findings and declaration contained in section 1, Act 307, Session Laws of Hawaii 1967, and further finds as follows:

(a) The fee simple ownership of residential lands in the State is still concentrated in the hands of a small number of landowners. The state and federal governments and the largest 72 private landowners own approximately 95 per cent of all land area within the State. On Oahu alone, 22 major private landowners own 72.5 per cent of all land.

(b) The small number of landowners have continued to follow the policy of not selling their lands for residential use but of leasing their lands under long-term residential leases. While fee simple ownership still accounted for 68.9 per cent of all owner-occupied housing on Oahu in 1972, leasehold residential development has dominated the housing market since 1967 as it had during the period 1950 to 1967. Between 1950 and 1966, 40 percent of all owner-occupied housing units developed on Oahu had been on leasehold. Between 1967 and 1972, 46 per cent of such development has been on leaseholds. In 1973, leaseholds constituted 32 per cent of all owner-occupied housing, more than double the percentage in 1960.

(c) The foregoing developments have compelled thousands of people in the State to resort to leaseholds to satisfy their housing needs, and this trend is likely to continue in view of the limited availability of land for residential purposes.

(d) Residential leaseholds have had and continue to have the following undesirable economic effects:

(1) The scarcity of fee simple residential lands have [sic] pushed the price of fee simple residential units to high levels;

(2) The high levels of fee simple residential unit prices have artificially raised the level of prices for leasehold units;

(3) The high prices commanded for leasehold units have encouraged the development of leasehold residential units and discouraged the development of fee simple units;

(4) The increases in the price for both fee simple and leasehold residential lands have caused lease rentals to increase on renegotiation of rentals (on the expiration of 25 or 30 years of initial fixed rent periods) ranging from 400 per cent to 1000 per cent, for renegotiated lease rentals are invariably tied to the fee simple value of the land on which the leasehold residences are situated, and these new lease rentals have at times exceeded the amount of the payments that the lessee had been making on the leasehold mortgages;

(5) Rental renegotiations have strongly favored the lessor, the lessee having little option but to consent to such rental as determined by the lessor or to give up the leasehold and home, although the lease may yet have 25 or more years to run; and

(6) The inequality of bargaining power has allowed lessors to charge lease rent based not only on the raw land value of the property but also on the value of the offsite and onsite improvements which have already been paid for or will be paid for by the lessee and on the value accruing thereon;

(7) The high increases in lease rentals have caused leasehold values to drop after the initial fixed rent period (e. g., a house appraised at $68,000 before renegotiation of lease rental was increased) [sic], causing lessees opting to dispose of their leasehold interests to suffer severe economic losses.

(e) Residential leaseholds have also undesirable social effects. Lease rent negotiations are usually scheduled every 10 to 15 years after the initial fixed rent period of 25 to 30 years. Thus, as the lessee advances in age and his income potential declines, his lease rentals increase, causing him to give up the lease and to look for other accommodations. Then, when the entire lease period expires, the lessee who has stayed on the leasehold for the full term of the lease is, by reason of age, income, and the lack of value remaining in the leasehold, left without means to purchase another home. These situations aggravated the already acute need for government-sponsored low and middle income and elderly housing. With the increasing number of elderly in this State, the problem promises to become even more acute in the foreseeable future, and will adversely affect the health and welfare of these people and the general welfare of the people of the State of Hawaii.

The legislature further finds and declares:

(1) That the land in Hawaii is to be considered as a source of life, dignity, and economic freedom for the men and women who reside on it;

(2) That it is the policy of the State that each person shall have the right of ownership of the land on which he makes his home;

(3) That it is also the policy of the State that the lessee of a residential unit, so long as he remains a lessee, shall have the right to have rentals set at reasonable levels and to enjoy his leasehold estate under reasonable leasehold terms;

(4) That the public health, safety, and welfare of the people of Hawaii demand that Act 307, Session Laws of Hawaii 1967, be fully implemented and that other applicable laws be enacted including legislation to prevent the imposition of confiscatory economic burdens upon the thousands of lessees presently living on leased property.

## ACT 185 FINDINGS
## AND PURPOSES

The legislature reaffirms its findings and declaration contained in section 1, Act 307, Session Laws of Hawaii 1967, and further finds as follows:

The home is the basic source of shelter and security in society, the center of our society which provides the basis for the development of our future citizens. Deprivation through exorbitant and unreasonable prices of this basic need results in frustrations and unrest in our community that is harmful to the overall fiber of our society.

Although Act 307 was enacted in 1967 the fee simple ownership of residential lands in the State is still concentrated in the hands of a small number of landowners. The state and federal governments and the largest 72 private landowners own approximately 95 percent of all land area within the State. On Oahu alone, 22 major private landowners own 72.5 percent of all land.

Along with this concentrated ownership of land there exists in the State of Hawaii a critical shortage of housing units for all income levels. There will be a need for over 250,000 low and middle income units by 1985 and a need will exist for all types of units. Since 1961 the economy has been producing an average of less than 10,000 low and middle income units annually. The economy has similarly lagged in the production of all other units, except the very high priced.

The small number of private landowners have continued to follow the policy of not selling their lands for residential use but of leasing their lands under long term residential leases. While fee simple ownership still accounted for 68.9 percent of all owner-occupied housing on Oahu in 1972, leasehold residential development has dominated the housing market since 1967 as it had during the period 1950 to 1967. Between 1950 and 1966, 40 percent of all owner-occupied housing units developed on Oahu had been leasehold. Between 1967–1972, 46 percent of such development has been on leaseholds.

The foregoing developments have compelled thousands of people in the State to resort to leasehold residences to satisfy their housing needs, and this trend is likely to continue in view of the limited availability of land for residential purposes.

The predictions of Act 307 as to effects of the residential leasehold system have proven to be conservative. Today, there are over 26,000 outstanding residential leases, an increase of more than 10,000, since Act 307 was enacted. As stated in Act 307, the concentration of land ownership "is in the rapidly developing urban areas of the State, where the need for single family residential lots is critical".

Initially, lease rents were low or were within the range which the public could afford. However, in the renegotiation of rents that have occurred in recent years, tremendous increases in lease rents have been imposed upon countless lessees by lessors. The compensation provided to be paid to lessors under Act 307 was directly related to the present value of the lease income stream generated under the lease to be condemned. Since June 24, 1967 lessors have generally adopted a practice of increasing lease rentals on renegotiations of existing leases in a manner unrelated to the raw land value, thereby greatly increasing the cost to the lessee when exercising his rights under Act 307 and resulting further in unconscionably increasing lease rents.

Renegotiation has brought about staggering increases in annual lease rentals. These increases have been the direct result of inflated land values which in turn have come about because of the supply of urban land for residential housing under the concentrated ownership described in the findings contained in Act 307. The effect of these increases has been to substantially increase the cost of leasing housing for the people of Hawaii. The increases in lease rentals and premiums required prior to leasing of residential property has accentuated the problem stated in section 1(g) of Act 307 to the effect that the continuation of the residential leasehold system causes an artificial inflation in the price of fee simple residential property, as well as leasehold residential property.

Further, because of the unequal bargaining power between large landowners and individual lessees there have been breakdowns in the normal processes of bargaining and freedom of contract, resulting in unjust, unreasonable and oppressive lease rents being exacted by lessors. Thus the limited supply of housing units and concentrated ownership of such units have led to the exaction of exorbitant lease rents on renegotiation. In many instances, the lessor's terms are peremptorily submitted to the lessee in ultimatum form through letters rather than through any actual bargaining process.

This unequal bargaining relationship exists today despite the rights granted lessees under Part III of Act 307 which was passed some seven years ago. Accordingly the adverse and harmful effects sought to be alleviated by that Act have not been stemmed, but to the contrary have become more critical.

In addition the inequality of bargaining power due to the oligopolistic imbalance in land ownership has allowed the lessor to charge lease rents based not only on the raw land value of the property but also on improvements which have already been paid for by the lessee and on the value accruing thereon; thus the lessee is, in effect, paying the lessor for an investment made by the lessee. This is an unjust enrichment created by an oligopolistic market lacking competitive bargaining and is contrary to the public welfare.

Inasmuch as the free market cannot correct this situation because of the lack of competition, inherent in an oligopolistic market, it is

pensation,[22] under either Amendment "public use" includes "public interest." [23]

■ Second, I am of the opinion that the statutory definition of "owner's basis" [24]

necessary for the public good and welfare that the imbalance be redressed.

Residential leaseholds have had and continue to have undesirable economic effects. The high prices commanded for leasehold units have encouraged the development of leasehold residential units and have discouraged the development of fee simple units. The increases in the price for both fee simple and leasehold residential lands have caused lease rentals to increase on renegotiation of rentals (on the expiration of 25 or 30 years of initial fixed rent periods) as much as 1000 percent; renegotiated lease rentals are invariably tied to the fee simple value of the land on which the leasehold residences are situated. These new lease rentals have at times exceeded the amount of the payments that the lessee had been making on the leasehold mortgages. Rental renegotiations have strongly favored the lessor, with the lessee having little option but to consent to such rental as determined by the lessor or to give up the leasehold, although the lease may yet have 25 or more years to run. The high increases in lease rentals have caused leasehold values to drop after the initial fixed rent period (e. g. a house appraised at $68,000 before renegotiation of lease rent has been appraised at $59,000 after the lease rental was increased), causing lessees opting to dispose of their leasehold interests to suffer severe economic losses.

Residential leaseholds have had undesirable social effects. Lease rent negotiations are usually scheduled every 10 to 15 years after the initial fixed rent period of 25 to 30 years. Thus, as the lessee advances in age and his income potential declines, his lease rentals increase, causing him to give up the lease and to look for other accommodations. Then, when the entire lease period expires, the lessee who has stayed on the leasehold for the full term of the lease is, by reason of age, income, and the lack of value remaining in the leasehold, left without means to purchase other housing. These situations have grave effects on the health, welfare and well-being of elderly persons and aggravate the already acute need for government-sponsored, low and middle income and elderly housing. With the increasing number of elderly in this State, the problem promises to become even more acute in the foreseeable future.

The legislature declares that it is the policy of the State that the lessee of a residential unit, so long as he remains a lessee, shall have the right to have rentals set at reasonable levels and to enjoy his leasehold estate under reasonable leasehold terms; that the public health, safety and welfare of the people of Hawaii demand that legislation be enacted to prevent the imposition of confiscatory economic burdens upon the lessees of residential property; that pursuant to and based upon the findings stated above, the public health, safety, and welfare is severely and substantially affected and threatened, resulting in immediate, continuous, and irreparable harm and that all the conditions and circumstances set forth herein constitute a social emergency which it is the purpose of this act to prevent and remedy.

### ACT 186 FINDINGS AND PURPOSE

Act 307, Session Laws of Hawaii 1967, now Chapter 516, Hawaii Revised Statutes, was intended to lessen the adverse consequences of the excessive concentration of the fee title to lands in Hawaii in the hands of a few owners by allowing residential leaseholders to acquire the fee simple title absolute or otherwise, to real property they were leasing.

The legislature finds that although the Act has been in full effect for nearly six years it has not been implemented. Many reasons have been cited for the failure to put the Act into effect including possible legal or constitutional difficulties inherent in the original Act.

The purpose of this Act is to reaffirm and reiterate the findings and declarations of necessity originally set forth in Act 307 and to amplify and clarify those findings and declarations of necessity. .

22. See Chicago Burlington & Quincy Railroad Co. v. City of Chicago, 166 U.S. 226, 233–41, 17 S.Ct. 581, 41 L.Ed. 979 (1897); Rodgers v. Tolson, 582 F.2d 315, 318 (4th Cir. 1978); Gordon v. City of Warren, 579 F.2d 386, 389–90 (6th Cir. 1978); O'Grady v. City of Montpelier, 573 F.2d 747, 750 n. 8 (2d Cir. 1978).

23. See The Public Use Limitation on Eminent Domain: An Advance Requiem, 58 YALE L.J. 599 (1949); Nichols, The Meaning of Public Use in the Law of Eminent Domain, 20 B.U.L. Rev. 615 (1940); New York City Housing Authority v. Muller, 270 N.Y. 333, 1 N.E.2d 153 (1936); Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834 (1938). See also cases cited in note 18, supra.

24. Haw.Rev.Stat. § 516–1(14) (1976). The definition reads as follows:

"Owner's basis" means the current fair market value of the lot. The fair market value shall be established to provide the lessor with just compensation for his interests in the lot and shall take into consideration every interest and equity of the lessee in establishing that market value. The value shall be determined by whichever following method provides just compensation and gives the greater consideration to the lessee's interest:

(A) The sum of: (i) the future rental stream for the lot for the term of the lease

raises serious constitutional questions. The first two sentences of Haw.Rev.Stat. 516–1(14) are not objectionable.[25] Thereafter, the definition attempts to qualify "fair market value" and "just compensation" by setting forth two and only two methods by which just compensation "shall" be determined, and by mandating that method which "gives the greater consideration to the lessee's interest."[26] Without going into the details of Method A[27] and Method B,[28] it is clear to me that the definition can pass

discounted to present worth from the expiration date of the lease; and (ii) the value of the lessor's reversionary interest in the lot discounted to present worth from the expiration date of the lease. The discount rate shall be based on the maximum rate of return for insured passbook demand saving account paid by the savings and loan institutions in Hawaii plus three and three-fourths per cent; provided, however, that the discount rate may be modified by mutual agreement of the lessor, lessee, and the authority; or

(B) The current fair market value of the lot, valued as if it were a fee simple lot and as if the fee title were unencumbered, and excluding onsite improvements, established by a market data approach utilizing comparable sales, less the following:

(i) The value of the lease, including any rights therein, if any, which accrues to the lessee;

(ii) That percentage of the general enhancement of the neighborhood which has been paid for or contributed directly or indirectly by the lessee;

(iii) The current replacement cost of that portion of existing offsite improvements, including overhead and profit at prevailing rates, which were paid for or otherwise contributed directly or indirectly by the lessee;

(iv) That percentage of the general enhancement of the development tract and the lot caused by the onsite improvements on the lot paid for, or contributed, directly or indirectly, by the lessee;

(v) That amount, not otherwise deducted herein, allocated to the lot, which was paid for or otherwise contributed, directly or indirectly by the original lessee, computed at prevailing rates for overhead and profit in developing the development tract established by existing practice in the community; and

(vi) That amount for fees and costs which would ordinarily be borne by lessor in transferring such interest to lessee, including, but not limited to, attorneys' or realtors' commissions, other costs of sale, and similar fee;

provided, however, that the values established by any one of the foregoing shall not be duplicated in any one of the other provisions.

**25.** These two sentences equate fair market value of the leased fee interest with just compensation to the lessor. This accords with accepted Constitutional requirements. *Backus v. Fort Street Union Depot Co.,* 169 U.S. 557, 573, 575, 18 S.Ct. 445, 42 L.Ed. 853 (1898); *United States v. Miller,* 317 U.S. 369, 373–74, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

**26.** Intervenors argue that the controlling phrase is "just compensation" and the rest of the definition must be read in that light. Thus if method "(A)" results in "just compensation" and method "(B)" does not, but method "(B)" gives "the greater consideration to the lessee's interest," method "(B)" is not to be used. Actually, the definition is logically incomplete as it does not provide for the circumstance wherein "just compensation" and "the greater consideration to the lessee's interest" do not both result from applying the same method. Beyond that, the definition is semantically inconsistent in that the use of a method that gives the lessee's interest greater consideration implies that that method gives the lessor's interest lesser consideration, which leaves the meaning of "just compensation" understandable only in terms of a dialect of newspeak.

**27.** Haw.Rev.Stat. § 516–1(14)(A) (1976), *supra* note 24. The method described is agreed by all testifying experts to be one acceptable method of determining fair market value of a leased fee interest, except that the discount rate should be determined by market conditions and not fixed by statute. The testimony was to the effect that application of the statutory formula resulted in a discount rate the same as or somewhat more favorable to the lessor than the discount rate in the market. While the method appears to be straight forward and definite, intervenors' experts testified that there were some six judgment calls that had to be made by an appraiser in using this method.

**28.** Haw.Rev.Stat. § 516–1(14)(B) (1976), *supra* note 24. Again all experts agreed that the *general* approach is one acceptable method of determining the fair market value of a leased fee interest. Plaintiffs' experts testified, however, that if followed literally, the method as defined could not result in "just compensation." Intervenors' experts testified that the method was presently rather useless because of the paucity of market data, and that the itemization of what to deduct was considered to be more of a checklist than a required list of items to be valued. Intervenors' appraisers con-

constitutional scrutiny under the Fourteenth Amendment only if everything after the first two sentences in this definition of "owner's basis" is ignored. That, in essence, is what I understand defendants and intervenors to argue that I should do.[29]

■ Third, I am of the opinion that the mandatory arbitration provisions of Part IIA[30] are unconstitutional on their face.[31] The statute provides that mandatory arbitration shall be in advance of and not any part of any action in eminent domain,[32] that mandatory arbitration shall be conducted and carried into effect before a condemnation action has been commenced,[33] and that the purpose of the mandatory arbitration is

"to establish [the] amount of just compensation which will be paid to lessor for the lessor's leased fee interest" in the event of condemnation[34] All defendants agree that the lessor eventually is accorded a right to a jury trial on the issue of just compensation,[35] that just compensation is equivalent to fair market value,[36] and that fair market value is to be determined by the jury based on all relevant evidence.[37]

The statute provides that the "effect of the arbitration award and all matters relating thereto shall be prima facie evidence as to just compensation in any condemnation proceeding under this chapter."[38] But the mandatory arbitration is to proceed pursu-

sidered items (ii), (iii), (iv), and (v) to be included under item (i), and all experts had difficulty accommodating item (vi).

29. One difficulty with the detailed and restrictive approach of § 516–1(14) is that it purports to exclude any method other than method "(A)" and method "(B)" as therein defined. But intervenors' experts testified that they did not consider themselves to be so restricted by the statutory language. Neither expert, in applying the statute, actually compared the results obtained by applying method "(A)" with the results obtained by applying method "(B)" to determine which method gave "the greater consideration to the lessee's interest," and both, in applying method "(A)" built in an inflation factor which offset the mandatory discount rate. In effect, they decided what in their opinion present fair market value of the leased fee interest in a lot amounted to, and then adjusted the several judgment calls involved to justify this opinion.

30. Haw.Rev.Stat. ch. 516 Part IIA (1976).

31. It is assumed, for purposes of this hearing, that we are only considering the application of these provisions to leases executed prior to June 15, 1976, the date this part took effect.

32. Haw.Rev.Stat. § 516–51(b) provides:
This mandatory arbitration shall be in advance of and shall not constitute any part of any action in condemnation or eminent domain.

33. Haw.Rev.Stat. § 516–53 (1976) provides:
Timing of mandatory arbitration. Mandatory arbitration under this part shall be conducted and carried into effect before a condemnation action has been commenced.

34. Haw.Rev.Stat. § 516–51(a) (1976) provides:
Mandatory arbitration of compensation authorized. (a) Upon the filing of a petition by

the number of lessees required by section 516–22 with the Hawaii housing authority, the authority shall request the lessor and the lessees or their designated agents to negotiate the just compensation which the lessees will pay to the lessor to acquire the lessor's interest in the development tract. If negotiations fail then the Hawaii housing authority shall direct the lessor and lessee to submit to mandatory arbitration under chapter 658 to establish an amount of just compensation which will be paid to lessor for the lessor's leased fee interest under section 516–24.

35. Haw.Rev.Stat. § 516–23 (1976) provides in part that "the authority shall exercise its power of eminent domain in the same manner as provided in chapter 101." Haw.Rev.Stat. ch. 101 (1976) contains Hawaii's general statutory provisions relating to eminent domain. § 101–11 provides that "the procedure shall be the same as in other civil actions." This includes the right to a jury trial on the issue of compensation or damages. See State v. Chang, 50 Haw. 195, 436 P.2d 3 (1967).

This is not to say that a State may not employ other procedures for determining just compensation. See Chicago, Burlington & Quincy Railroad Co. v. City of Chicago, 166 U.S. 226, 236, 17 S.Ct. 581, 41 L.Ed. 979 (1897); 12 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 3055 (1973). Here, mandatory arbitration is specifically stated not to be any part of any action in eminent domain. See notes 32 and 33, supra.

36. See cases cited in note 25 supra.

37. See United States v. Miller, 317 U.S. 369, 373–75, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

38. Haw.Rev.Stat. § 516–55 (1976).

ant to Haw.Rev.Stat. Chap. 658,[39] which provides for proceedings in a circuit court confirming, vacating, modifying, or correcting an award, and a further appeal to the State supreme court.[40] By the time these procedures have been completed, considerable time will have elapsed.[41] Yet the date of valuation in condemnation is the date of designation by the Hawaii Housing Authority,[42] which has no necessary relationship to the date as of which "just compensation" is determined pursuant to the mandatory arbitration, and would be expected to come after the final completion of the mandatory arbitration proceedings and a further refusal by the lessor to convey.[43]

And then when the final judgment has been entered determining the arbitration award, the lessee does not have to purchase the lessor's leased fee interest,[44] and the Hawaii Housing Authority does not have to commence condemnation proceedings.[45] Nevertheless, and even if there is a purchase or a condemnation, the lessor must pay one-half of all expenses and fees of arbitration proceedings incurred by the arbitrators,[46] without reimbursement.[47] This in itself may be a taking of property without just compensation.[48]

■ Having reached the conclusions set forth above, I must still decide whether a preliminary injunction should issue and if so what should be enjoined. The statute in question contains a very comprehensive severability clause.[49] Thus, unless the statute

---

39. Haw.Rev.Stat. § 516–51(a) and § 516–54(a)(6) (1976).

40. Haw.Rev.Stat. § 516–54(a)(6) (appeal to circuit court), § 658–8 (award; confirming award), § 658–9 (vacating award), § 658–10 (modifying or correcting award), § 658–15 (appeal when) (1976).

41. "The Supreme Court of Hawaii is falling alarmingly behind in disposing of its expanding caseload. The current backlog is sufficient, given existing disposition rates, to occupy the Court for three years." Levinson, *Appellate Caseload in Hawaii,* 13 HAW.BAR J. (No. 3) 3 (1977).

42. Haw.Rev.Stat. § 516–24 provides that the compensation to be paid for the lessor's leased fee interest "shall be determined as of the date* of the designation of the applicable portion of the development tract for acquisition."

43. The mandatory arbitration provisions of the chapter do not specify the date as of which "just compensation" shall be determined. Presumably the arbitrators will specify the date they have used in reaching their award. § 516–51(a) does provide that the purpose of the mandatory arbitration is "to establish an amount of just compensation which will be paid to lessor for the lessor's leased fee interest" under § 516–24. But for the latter purpose, by § 516–24, just compensation is to be determined as of the date of designation, which by § 516–53 is supposed to come after the completion of arbitration. Since the arbitrators can hardly be expected to guess when the Hawaii Housing Authority will designate a development tract for acquisition, the date of valuation for purposes of mandatory arbitration and the date of valuation for purposes of condemnation will necessarily be different, by possibly several years.

44. The only effect of the arbitration award is that it "shall be prima facie evidence as to just compensation in any condemnation proceeding under this chapter." Haw.Rev.Stat. § 516–55 (1976).

45. Haw.Rev.Stat. § 516–51(b) (1976).

46. Haw.Rev.Stat. § 516–54(a)(5) (1976) provides:

All expenses and fees of arbitration proceedings incurred by arbitrators shall be paid one-half by lessors and one-half by lessees.

47. Haw.Rev.Stat. § 516–23 (1976) provides in part that, after a designation pursuant to § 516–22:

If the development tract or applicable portion thereof, as the case may be, is not acquired or eminent domain proceedings are not instituted within the twelve-month period [after designation], the authority shall reimburse the fee owner, the lessor and the legal and equitable owners of the land so designated for actual out-of-pocket expenses of appraisal, survey, and attorney fees as the owner, the lessor, and the legal and equitable owners' may have incurred as a result of the designation.

There is no similar provision with respect to the expenses incurred as a result of the mandatory arbitration proceedings of Part IIA.

48. *See* 12 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 3056 (1973); *Supplementary Report of the Advisory Committee on Rule Governing Condemnation Cases,* 11 F.R.D. 222, 243 (1951).

49. Haw.Rev.Stat. § 516–82 (1976). Although the statutory provision came from 1975 Haw. Sess.Laws Act 184 § 2, similar severability pro-

must stand or fall as a whole, specific provisions that may be invalid may be separated out, leaving the other provisions in force.

■ I am of the opinion that those portions of the definition of the "owner's basis" to which the Trustees object are severable. I frankly do not believe that striking everything after the first two sentences in Haw.Rev.Stat. 516–1(14) would have any effect whatsoever on the operation of the statute or on the manner in which appraisers value the lessor's leased fee interest.[50] In any event, there is no pending matter involving these objected-to provisions that requires a preliminary injunction.

■ I am of the opinion that the mandatory arbitration provisions of the statute likewise are severable. In fact, the statute as originally passed did not contain this part, which was added in 1976.[51] Unlike the objectionable features of the "owner's basis" definition, however, the Trustees are presently faced with a demand by the Hawaii Housing Authority to enter into mandatory arbitration pursuant to the statute.[52]

As I have indicated that in my opinion the Trustees will probably succeed on the merits of this issue, I must determine whether there is possible irreparable injury to the Bishop Estate or a balance of hardships tipping decidedly toward the Trustees so as to make just and proper the issuance of a preliminary injunction enjoining the implementation of Part IIA of Chapter 516 of the Hawaii Revised Statutes.

A preliminary injunction limited to mandatory arbitration affects only one pending group of lessees of 102 lots.[53] It is not likely that many other lessees would be similarly affected for several months. Even those prevented by a preliminary injunction from starting the mandatory arbitration procedures may seek a designation pursuant to Haw.Rev.Stat. § 516–22 which would have the effect of fixing the date of valuation.[54]

On the other hand, the Trustees would be forced into a proceeding which could set a precedent affecting several thousand lots[55] and which could make them liable for an

visions were contained in 1967 Haw.Sess.Laws Act 307 § 44, and in 1976 Haw.Sess.Laws Act 242 § 6.

50. *See* discussion in notes 26, 27, 28, and 29, *supra.* None of this language was in the original Hawaii Land Reform Act. *See* legislative history set out in note 13, *supra.*

51. *See* discussion in note 15, *supra.*

52. Letter dated January 22, 1979, from the Acting Executive Director of the Hawaii Housing Authority to the Trustees of the Bishop Estate informing the Trustees that the Commission of the Authority on January 18, 1979, had by a unanimous vote decided to invoke mandatory arbitration in connection with the leasehold to fee simple conversion of lots in Tract H as requested by the Wai-Kahala Tract H Association, Inc., and pursuant to the Authority's Rule 10, Section 10. The latter concluded with the directive that "the parties are ordered to begin mandatory arbitration upon receipt of this notice."
An earlier letter dated August 21, 1978, from the Land Reform Administrator to the Trustees notified the Trustees that Tract H petitioners had "asked to proceed to arbitration" and stated that "it is appropriate that the arbitration period required by. that section [1976 Haw. Sess.Laws Act 242 § 4] commence." This let-

ter advised the Trustees that "you have 30 days from the date of receipt of this letter to name an arbitrator; the petitioners are also naming an arbitrator." The Trustees refused to name an arbitrator. Among other grounds, they did not consider this letter as having been properly authorized.

53. The only group of Bishop Estate lessees who have progressed to the point where the Hawaii Housing Authority may direct the lessor and lessees to submit to mandatory arbitration are those in so-called Tract H represented by WAI–KAHALA TRACT H ASSOCIATION, INC. Tract H comprises 102 lots.

54. Haw.Rev.Stat. § 516–22 and § 516–24 (1976). While Part IIA provides that mandatory arbitration shall precede condemnation, there is no requirement that mandatory arbitration shall precede designation.

55. While Tract H of 102 lots is the only Bishop Estate development tract which is presently at the stage when mandatory arbitration may be ordered, several other Bishop Estate tracts involving about 7,000 lots are going through the procedures established by the Hawaii Land Reform Act for leasehold to fee simple conversion.

indeterminate amount in unrecoverable costs.[56]

As I balance the relative interests of the parties and of the public, I am of the opinion that the *Aguirre* test for the issuance of a preliminary injunction has been met.

The preliminary injunction shall be in the same form as the Temporary Restraining Order as modified on March 27, 1979,[57] with the further proviso that steps outside of Part IIA, specifically designation and commencement of condemnation proceedings, are not enjoined under this preliminary injunction.[58]

Intervenors suggest security in the amount of $1,000,000 to cover possible damages to lessees for a wrongful injunction. The Trustees suggested and posted security in the amount of $100 on the temporary restraining order. In my opinion, each lessee is adequately secured against inflationary or real increases in value by the lessor's leasehold fee interests in the lot leased by the lessee. This is not to imply that the lessees might have any claim. The injunction actually runs only against the Hawaii Housing Authority. I do believe, however, that a more substantial sum than $100 is called for, notwithstanding the financial resources of the Bishop Estate. Under the circumstances I believe security in the sum of $10,000 would be proper.

Counsel for the respective parties and intervenors shall attempt to agree upon a form of preliminary injunction for submission to the court on or before May 15, 1979, or in default of agreement, shall submit their respective suggestions on the same date.

The foregoing constitute the court's findings and reasons required by Rule 65(d) of the Federal Rules of Civil Procedure.

---

**56.** From 1918 through March 1977, the Bishop Estate executed some 20,735 residential leases in development tracts. At present there are in force some 13,500 such leaseholds involving approximately 3,500 acres of land. 6,280 leases of lots in residential development tracts were executed from 1967 to 1977, inclusive.

**57.** Restraining only steps under Part IIA following a letter from the Hawaii Housing Authority directing the lessor and the lessee(s) to submit to mandatory arbitration.

**58.** Plaintiffs cannot be seriously damaged in the next several months as actual condemnation is not that imminent. In this area, a balancing of the interests of the parties and of the public leads me to the conclusion that a preliminary injunction should not issue, even if plaintiffs might ultimately prevail on their claim that the State's power of eminent domain may not be used to accomplish the purposes of the Hawaii Land Reform Act.